THE STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v. ADELE GUIDO, DEFENDANT-APPELLANT.

Argued February 19, 1963—Decided May 20, 1963.

194

*Mr. Howard Stern* argued the cause for appellant.

*Mr. Archibald Kreiger,* Assistant Prosecutor, argued the cause for respondent (*Mr. John G. Thevos,* Passaic County Prosecutor, attorney).

The opinion of the court was delivered by

WEINTRAUB, C. J. Adele Guido was convicted of murder in the second degree and sentenced to imprisonment for a minimum of 24 years and a maximum of 27 years. She appeals directly to this Court pursuant to *R. R.* 1 :2–1 (c).

The victim was defendant's husband. When they first met, she was a young girl and he a professional fighter of some success. He was living apart from his then wife who was suffering from a serious illness. In 1952 defendant and Guido began to live together and in 1953, after the then Mrs. Guido died, they were joined by Guido's child, Lois, age 13. In 1954 they married.

In 1957 defendant gave birth to a daughter, Ava. It was about that time that the deceased became involved with another woman with whom he was intimate until his death. About April 1960, which was one year before the shooting,

decedent went to Florida where he lived with his lady friend. In June 1960 defendant sought unsuccessfully to obtain support through a complaint filed in our State. In December defendant made a brief visit on which he effected a paper reconciliation, following which he returned to Florida. In the months that followed, the deceased returned to New Jersey a number of times for brief periods. It was upon such a visit that he was killed.

All the details of the marital discord need not be stated. It is enough to say it could be found that deceased failed to support defendant or their child; that she sought unsuccessfully to obtain support by judicial proceedings; that she wanted a divorce, while decedent insisted upon holding on to her notwithstanding he would not or could not end his extramarital romance and assume the role of a responsible husband and parent.

The final episode occurred in April 1961. Defendant had moved from their bungalow in New Jersey to a hotel in New York and was actively dealing with an attorney for the purpose of divorce. Lois was living with her, and the infant Ava was with defendant's friends. Guido, returning from Florida and finding defendant had left the New Jersey home, went to her place of employment in New York where, according to defendant and her employer, Guido set upon her forcefully, attempting to choke her and brandishing a pocket knife. He was placated by the employer. Guido insisted defendant return to the New Jersey bungalow and she did.

Back at the bungalow, decedent pressed defendant to move with him to Florida, the infant Ava to remain in New York with defendant's friends. He urged defendant and Lois to raise the necessary funds. Defendant would not agree to his plans. According to her, deceased took a weapon from his traveling bag and threatened to use it, on their child if need be, if she thwarted him. In the early morning of April 17, 1961, after deceased fell asleep on a couch in the living room while watching television, defendant, according to her testimony, took the gun and went into her room, intending to end

her life. Deciding that suicide would be no solution, she returned to the living room to put the weapon back in the suitcase, but when her eyes fell upon Guido, she raised the weapon and fired until it was empty.

With respect to physical abuse, the jury could find that although there were only a few incidents of actual injury, there was the constant threat of it from a man who had to have his way and who would not let go of a woman who had had her fill. It appears that on several occasions shortly before the homicide defendant called the local police to express her fear of harm.

The foregoing resume rests heavily upon defendant's testimony. Her portrait of the deceased was, however, supported by his own daughter, Lois, and we add that we find no evidence which affirmatively questions it. In any event, the jury could so view the case, and hence it is in that light that we must consider the impact of the errors claimed on this appeal.

## I.

As we have indicated, the defense pictured Guido as a worthless man of brutal bent. Defendant claimed the vise in which he held her was too much; that she at first thought of suicide, but realizing that it was no answer, she started to return the weapon to Guido's bag only to open fire when she caught sight of the man who would not let her alone. The State, however, contended defendant's motivation was quite different. It contended defendant knew she was pregnant by another man and killed her husband because she feared his reaction if he should learn she was unfaithful. For that thesis two elements would be necessary: (1) that defendant knew she was pregnant, and (2) that her husband could not have caused her condition. We find no proof of either.

As to the first, there is nothing to suggest defendant knew she was pregnant at the time of the shooting. She denied knowledge until she experienced a miscarriage in jail. The medical testimony established that at the time of the shooting

defendant's menstrual period was but a week or so overdue. We note also that in the statement she gave the police some six or seven hours after the homicide, there was not a trace of preoccupation with pregnancy, although the questions put to her would easily have permitted her to claim sexual experience with her husband if the thesis of the State were in her mind.

Nor was there proof that Guido had no access to her. The State relies entirely upon the statement, just mentioned, taken from defendant some six or seven hours after the shooting, wherein she was questioned about her sexual relations with the deceased. Since no one then had any notion that she was pregnant, the questions were not pointedly phrased nor were the answers viewed in that light. The State, however, attempts to read the record of that interview to say that defendant last had relations with the deceased in January. We think that reading is unwarranted. Rather she said she had relations with him "when he first came home in January * * * because I was hoping for a reconciliation at that time for the sake of my child," and:

"Q. From *then on*, when he saw you, did he insist on having these relations? A. Yes.

Q. And you refused? A. Yes. *Eventually, yes*, because I felt that his intentions were not good and that he was just using me.

Q. You did not give him the same excuse that you gave at the bungalow, that you were not feeling well every time? A. No, not every time." (Emphasis added)

All that appears is that "eventually," at some unspecified time, defendant "refused," in the interrogator's word, the importunings of her husband by advancing sundry excuses. It would be unreasonable to permit the State to advance so serious a charge upon what at best is an ambiguity, and indeed an ambiguity of the State's own making in its unilateral questioning of defendant.

Thus, with nothing to sustain it, the State pressed the theme that defendant planned this killing to hide her pregnancy. The theme was stated in the prosecutor's opening. The State called one Vincent Vella, who admitted he had

been in defendant's company on several occasions along with Lois and Lois's escort, but who denied sexual relations with defendant. The State pleaded "surprise" and was permitted to neutralize his testimony. The only deviation from the pretrial statement was with respect to the date when Vella last saw defendant, but in the "neutralization" the prosecutor brought out that before trial Vella had refused to answer questions relating to intimacy. In any event the jury had before it a man the State charged to be responsible for her pregnancy. More than that, the trial court unnecessarily asked Vella whether he was married, to which he replied that he was, adding that he had five children.

The State then produced the obstetrician who attended defendant in connection with the miscarriage and had him describe the surgical procedures he used. We note that on cross-examination it was developed that defendant could well have been unaware of pregnancy at the time of the homicide.

The subject reared again during the direct examination of a psychiatrist the defense called on the issue of insanity. When the hypothetical question propounded by the defense was finished, the prosecutor objected that it did not include all the evidence in the State's case. The objection was clearly unsound, since a party need not accept the contentions of his adversary in framing his question. Rather such matters may be explored on cross-examination. *State v. Bertone,* 39 *N. J.* 356, 363 (1963). The trial court, however, sustained the State's objection and at great length both the prosecutor and the trial court suggested what more should be included. With respect to the immediate subject of pregnancy as the motive for the slaying, the prosecutor insisted that the question include the fact of miscarriage and defendant's relationship with Vella, and referred to the portion of the statement taken from defendant on the morning of the shooting from which the State insisted, erroneously as we have said, that she last had intercourse with her husband in January. Over his objection, counsel for defendant had to incorporate that claim. The prosecutor cross-examined the doctor along the same line.

The trial court questioned the doctor as to whether, if defendant was conscious of guilt because of infidelity, "another escape" would be "destruction of the individual, namely, her husband." Later, the trial court returned to the subject, and referring to defendant's condition immediately after the shooting asked the witness:

"And Doctor, at that moment, she was safe from fear that her child would be killed by her husband and she was also safe from fear of detection of alleged infidelity, wasn't she?"

to which the doctor replied that defendant had not expressed any such thought to him.

In his summation the prosecutor charged that defendant had departed from her statement given on the morning of the homicide "in order to try to get away from the stigma that Alfred Guido could not have been the father of the baby that she miscarried on May the 2nd." The prosecutor then referred to the details of the testimony of Vella notwithstanding it had been "neutralized." Finally, the trial court, in instructing the jury to disregard Vella's testimony, read it at length so that, although no doubt the trial court meant only to be sure the jury understood precisely what had been erased, there nonetheless was a final reminder of the thesis for which there was no supporting evidence at all.

Thus throughout the trial the State contended that defendant killed to conceal her pregnancy by another. The trial court denied the defense motion to remove the subject from the case. We need hardly comment upon the capacity for harm of that unsupported thesis in a case in which the defendant contended that she figuratively exploded under pressures brutally applied to her by the deceased.

We should add an observation with respect to the problem posed by the State's plea of "surprise" to Vella's testimony. It is perfectly apparent that before Vella was called, the State had been told it would get the very answers he gave but nonetheless it called him to the stand. Defendant says the prosecutor therefore was not "surprised" by the disap-

pointing answers and neutralization should not have been permitted, citing *State v. Caccavale,* 58 *N. J. Super.* 560, 573 (*App. Div.* 1959). As the Appellate Division there said, in some cases there may be residual harm despite a trial court's firmest effort to erase what is revealed before the jury in the neutralizing process. Yet the State should not be compelled to accept an unsworn disavowal, for it may not really know whether the witness will, under oath, maintain the second story. *Cf. State v. DeCola,* 33 *N. J.* 335, 351 (1960). We think that fairness can be assured in the following way. When counsel has been advised a witness will not adhere to a prior statement but feels he should test that disavowal under oath, he should so inform the court at side bar. The witness should then be examined in the absence of the jury. So much of his testimony as is not neutralized may then be repeated in its presence.

## II.

Defendant asserts she was denied a fair trial by reason of a number of incidents.

### A.

Defendant claimed "temporary" insanity. She was examined by two court-appointed psychiatrists who jointly reported in writing to her then attorney, Mr. Teich. Later the court relieved Mr. Teich and assigned Mr. Saltzman to whom Mr. Teich delivered the psychiatric report. The report contained sundry medical findings and ultimately the opinion that defendant was "legally" sane at the time of the shooting. Mr. Saltzman met with the psychiatrists, and after some three hours of debate the psychiatrists changed their opinion as to "legal" insanity although their underlying medical findings remained the same. They then retyped the last page of their report.

On cross-examination of the first defense psychiatrist, it was developed that the original report had been revised. We do not know how the prosecutor learned of the change. The

record shows that on its own initiative the court immediately directed that "Counsel shall produce the original report to the prosecutor." Mr. Saltzman said he did not have it with him, to which the court responded, "We will take an adjournment until it's produced." The record reveals a short recess and then further proceedings out of the presence of the jury. What followed was some high drama that the occasion did not warrant.

Mr. Saltzman had returned from his office with the original report. The court undertook to interrogate him with respect to the receipt of the changed last page, at which juncture Mr. Teich appeared in response to an earlier telephone call from the court. The court directed Mr. Teich to step forward and to produce a photostatic copy of the report he had given to Mr. Saltzman, announcing "It shall be marked for identification at the direction of the Court." With much formality the trial court examined Mr. Teich "as an officer of the Court," elicited step by step the receipt and transmittal of the papers, and directed that the receipt given by Mr. Saltzman to Mr. Teich be marked as an exhibit. The trial then resumed before the jury. Later the court on its own motion ordered the original report and the substituted last page to be marked in evidence "at the direction of the Court."

Defense counsel and defense psychiatrists were thus subjected to a humiliating experience. Later the prosecutor berated them in his summation. He said "the defense in this case—I am sorry to say this—has been concocted"; "I have been practicing at the bar of this State for a good many years, ladies and gentlemen, and this was the first time in my experience that I came across doctors who changed their opinion just to suit the defense that Mr. Saltzman wanted to make in this case"; that Mr. Saltzman was "in cahoots with Doctors Galen and Chodosh and perpetrated a fraud on this Court"; and "how, how can you believe a woman who lends herself to the deception that was practiced on the Court, on this Court by the doctors and her attorney? Certainly she knew about it."

The trial judge did not stop this unjustifiable attack. See *State v. Thornton,* 38 *N. J.* 380, 396 (1962) ; *State v. West,* 29 *N. J.* 327, 338 (1959). On the contrary he intervened in a way that tended to sustain it. When in amplifying why he called it a "fraud" the prosecutor said the original report of the defense psychiatrists had been sent to "Judge Teich," the court interrupted to say that it might be "misleading" to refer to Mr. Teich as "Judge" since he was attorney for the defendant, to which the prosecutor agreed. The prosecutor then said that "When he [Mr. Teich] saw this report, he very properly concluded that—" whereupon the trial court correctly stopped the prosecutor, but then unfortunately suggested, "You may tell the jury that he asked to be relieved and he was relieved by the Court." Defendant protests before us that in fact Mr. Teich was relieved upon her request and not his, but in any event the reference to the subject in the context of the prosecutor's baseless charge of fraud tended to imply the change of counsel was connected with dissatisfaction with the medical report and a plan to fabricate a defense of insanity.

When the basis of the change in the experts' opinion was explored, it quickly appeared that the change was thoroughly consistent with honesty however mistaken it might be. In the minds of the witnesses the change involved no alteration whatever in their medical findings. Rather it stemmed from an altered understanding of the law's concept of insanity. Specifically, the doctors originally understood that the "disease of the mind" required by the *M'Naghten* concept of legal insanity to which we adhere, *State v. Lucas,* 30 *N. J.* 37, 68 (1959), means a *psychosis* and not some lesser illness or functional aberration. As the result of their pretrial debate with Mr. Saltzman, the doctors concluded they had had too narrow a view of *M'Naghten* and that the "anxiety neurosis" they had found did qualify as a "disease" within the legal rule, and hence when the anxiety reached a "panic" state, "meaning simply a severe disorganizing degree of anxiety," defendant did not know right from wrong and she did not know what

she was doing was wrong because of that "disease." In his further words, Dr. Galen said "That it is our opinion that this woman at the time of the crime was unable to differentiate right from wrong and the nature and consequences of her act, by virtue not so much of the existence of a psychosis, but by virtue of the ascendancy of the unconscious drives which rendered her, in a legal sense, temporarily insane."

· The State's psychiatrists found signs or symptoms apparently not too dissimilar from those found by the defense psychiatrists, but, as we understand their testimony, they did not consider what they found to be a psychosis or that her reason was impaired. One State psychiatrist, asked by the prosecutor to comment on the report of the defense experts, apparently concluded that in changing their opinion the defense witnesses had applied the test of legal insanity advanced by *Durham v. United States,* 214 *F. 2d* 862 (*D. C. Cir.* 1954). We refer to that observation, not to agree with it, but rather to emphasize how much the to-do stemmed from a doctor's effort to grasp what the law has in mind.

The change in the opinions of the defense psychiatrists simply focuses attention upon an area of undeniable obscurity. As we have said, the *M'Naghten* rule requires a "disease of the mind." The competing concepts of legal insanity also require a disease (or defect) of the mind. See *State v. White,* 27 *N. J.* 158, 164 (1958); *Durham v. United States, supra* (214 *F. 2d,* at *pp.* 874–75); *United States v. Currens,* 290 *F. 2d* 751, 774 (3 *Cir.* 1961); *Model Penal Code* § 4.01 (*Proposed Official Draft,* May 4, 1962); Swartz, " 'Mental Disease': The Groundwork for Legal Analysis and Legislative Action," 111 *U. Pa. L. Rev.* 389 (1963). But the hard question under any concept of legal insanity is, What constitutes a "disease"?[1] The frame of reference is criminal responsi-

---

[1] In adopting the disease-product test, *Durham* left unanswered the question as to what constitutes a disease capable of exempting a defendant from criminal accountability under that concept. To illustrate the depth of the problem it left unresolved, we need but refer to the quarrel under *Durham* as to whether the so-called psyco-

bility, and the issue is whether a given wrongdoer should be stamped a criminal because of his act. The postulate is that some wrongdoers are sick while others are bad, and that it is against good morals to stigmatize the sick. Who then are the sick whose illness shows they are free of moral blame? We cannot turn to the psychiatrist for a list of illnesses which have that quality because, for all his insight into the dynamics of behavior, he has not solved the riddle of blame. The question remains an ethical one, the answer to which lies beyond scientific truth.

The *M'Naghten* rule does not identify the disease which will excuse, but rather stresses a specific effect of disease, *i. e.,* that at the time of the committing of the act the accused was laboring under a defect of reason such as not to know the nature and quality of the act he was doing, or, if he did know it, that he did not know what he was doing was wrong. But although emphasis is thus upon a state of mind, it is nonetheless required that that state be due to "disease" and not something else. So our cases contrast that concept of insanity with "emotional insanity" or "moral insanity" which, upon the dichotomy mentioned above, is attributed to moral depravity or weakness and hence will not excuse the offender even if his rage was so blinding that he did not really appreciate what he was doing or that it was wrong. *State v. DiPaolo,* 34 *N. J.* 279, 298 (1961). And we may contrast the *M'Naghten* concept with the definition of manslaughter, *i. e.,* "the heat of a passion resulting from a reasonable provocation, a passion which effectively deprived the killer of the mastery of his understanding, a passion which was acted upon before a time

path or sociopath suffers from "disease." See Burger, J., in *Blocker v. United States,* 288 *F.* 2d 853, 857 (*D. C. Cir.* 1961) (concurring opinion) and *Campbell v. United States,* 307 *F.* 2d 597, 603 (*D. C. Cir.* 1962) (dissenting opinion). And we add that under the test of the *Model Penal Code* (§ 4.01) "mental disease or defect" would not embrace the psycopath. As the comment to that section (*Tentative Draft No. 4, p.* 160, April 25, 1955) points out, this too is the view taken in the *Report of Royal Commission on Capital Punishment* (1953), *par.* 313, *pp.* 109–10, *par.* 401, *p.* 139.

sufficient to permit reason to resume its sway had passed."
*State v. King*, 37 *N. J.* 285, 300 (1962).

Thus *M'Naghten* recognizes the impairment of the intellectual faculty only if it ensues from a "disease" of the mind and differentiates it from a state of mind, however similar, which is not induced by disease. Yet the traditional charge of the *M'Naghten* rule to the jury does not attempt to say what is meant by "disease," *State v. DiPaolo, supra* (34 *N. J.*, at *p.* 292), and the rather universal reluctance to assay a definition is evident from the discussion of *M'Naghten* in the *Report of the Royal Commission on Capital Punishment* (1953), *par.* 226, *p.* 79, *et seq.* It is clear of course that a psychosis, as that disease is generally understood medically, is a competent cause of the required mental state. But what of other or lesser illnesses or conditions?

Our cases seem not to have explored the question. *State v. White, supra* (27 *N. J.* 158), involved psychopathic personality, but we were not called upon to decide whether the condition so denominated is a disease of the mind within the meaning of *M'Naghten*. And so here, the testimony having been submitted to the jury on the issue of insanity and the parties therefore not having argued the question, we should not finally decide whether the testimony of the psychiatrists revealed a disease within our legal doctrine even though the thinness of their testimony is apparent. We have described the problem, not to resolve it, but simply to reveal the room for disputation, to the end of demonstrating the unfairness of charging defendant, her attorney, and her witnesses with a fraud when the change in the experts' opinion, however frivolous it may be in law, involved no departure from prior medical findings but rather a change in the witnesses' understanding of what the law means by "disease."

### B.

It is convenient at this juncture to consider defendant's claim that the trial court erred in ordering defense coun-

sel to make the original report of the defense psychiatrists available to the prosecutor for his use in cross-examining them. We note that counsel for defendant did not object at the trial. We will, however, pass the question of waiver and deal with the issue as presented to us.

Defendant refers to *State v. Kociolek*, 23 *N. J.* 400 (1957). There defense counsel had retained a psychiatrist to assist him in deciding whether to advance a claim of insanity. The report of the doctor was unfavorable and the defendant did not call him. The State, however, used the doctor on rebuttal and through him proved certain factual admissions by defendant which conflicted with defendant's testimony. We held that communications which a defendant makes to a doctor retained to assist his counsel are protected by the attorney-client privilege just as such communications would be if made by the client directly to the attorney. We held the privilege protected as well the opinion expressed by the expert to the attorney since it could hardly be revealed without disclosing the client's communications. And finally we held that defendant did not "waive" the privilege merely by testifying in his own defense. 8 *Wigmore, Evidence (McNaughton rev.* 1961), § 2327, *p.* 634.

Here, however, the defense itself called the doctor to prove what the defendant had said to the doctor and the doctor's ultimate opinion based in part thereon. The defense thus deliberately lifted the veil which had theretofore protected the communication.

We see no reason to bar inquiry as to whether the witness had held another opinion, what it was, and why it was changed. The issue involves a balancing of values. The privilege protects the public interest in a vital relationship. The protection accorded must be equal to the end to be served, and it is equal to that end when the State is barred from initiating an inquiry with respect to the communication. When, however, the defense decides to use the communication in the courtroom, the privilege, which has served the purpose for which it was devised, yields to the public interest in the dis-

closure of the whole truth with respect to both the facts and the opinion thereon which the defendant chose to make the subject of testimonial examination.

## C.

■■ Defendant refers to a number of further instances in support of her charge that the trial court so interfered in the conduct of the proceeding as to deny her a fair trial. Her complaint is that the court participated in the testimonial process in a way likely to prejudice the jury's consideration of the testimony. A trial judge may and indeed in some situations should intervene. So, for example, he should not sit by if the basic rights of a litigant are invaded by the plainly improper tactics of opposing counsel. In short, a fair trial is his responsibility and he should assure it notwithstanding that counsel may fail to protest. No situation of that kind was involved in the incidents of which defendant complains. Rather we are concerned with the discretionary power of a court to intervene to facilitate the trial, and as to this, it is difficult to improve upon the standard and caveat in *Canon* 15 of the *Canons of Judicial Ethics:*

"A judge may properly intervene in a trial of a case to promote expedition, and prevent unnecessary waste of time, or to clear up some obscurity, but he should bear in mind that his undue interference, impatience, or participation in the examination of witnesses, or a severe attitude on his part toward witnesses, especially those who are excited or terrified by the unusual circumstances of a trial, may tend to prevent the proper presentation of the cause, or the ascertainment of the truth in respect thereto."

■ Here there was no question of delay or waste of time nor of blatant falsehood. The interventions were presumably intended to clarify by exploring what the court thought were inconsistencies or incongruities. The discretionary power of a trial judge thus to participate in the development of proof is of high value, see *State v. Riley,* 28 *N. J.* 188, 200 (1958), but obviously it is an authority which should be used with

care. *Ridgewood v. Sreel Investment Corp.,* 28 *N. J.* 121, 132 (1958). The trial judge is an imposing figure. To the jurors he is a symbol of experience, wisdom, and impartiality. If he so intervenes as to suggest disbelief, the impact upon the jurors may be critical. Hence in the usual case it is well to leave the primary burden of examination with counsel and to supplement their efforts, if necessary to clarify the scene, in a way which will lead the jurors to believe the objective is their better understanding.

It is difficult to review a charge of unfairness upon a dry record. A person's manner may negate a barb his printed word seems to hold, just as it may supply a sting the record will not show. On the one hand we know from his repeated protests that defense counsel felt his cause was injured, while on the other we have the trial judge's repeated assurances to the jury that he was acting in the interest of justice with no purpose of aiding or hurting the prosecution or the defense. Despite the inherent difficulty of judging the complaints before us, we are persuaded that in some instances the trial court intervened unnecessarily and in a way that could prejudice the jury's approach to the factual issues.

We see no need to burden this lengthy opinion with a detailed discussion since for the reasons already given the judgment must be reversed. Hence we will but briefly in a footnote summarize three instances of which defendant understandably complains.[2]

----

[2] In testifying about the deceased's attack upon her at her place of employment, defendant referred to her employer by his first name. The trial judge questioned her and later her employer as to whether they thus addressed each other and the answer was that they did. The trial judge's inquiry could suggest that he deemed it a dark matter that employer and employee were so familiar.

Speaking of the events of the night before the homicide, defendant said on cross-examination that the deceased "demanded" sex relations; that she "refused" but nonetheless such relations were had, whereupon the record continues:

"Q. So then you did consent? A. It was over my protest.

## III.

We need consider only one other matter.

Defendant complains of the trial court's refusal to submit the issue of manslaughter to the jury.

 Voluntary manslaughter is a slaying committed in a transport of passion or heat of blood induced by an adequate provocation, provided the killing occurs before the passage of time sufficient for an ordinary person in like circumstances to cool off. *State v. King, supra* (37 *N. J.,* at *pp.* 300–01); *State v. Wynn,* 21 *N. J.* 264, 270 (1956); *Perkins, Criminal Law* 43, 53 (1957); 1 *Warren, Homicide* §§ 90–91, *p.* 433 (1938). The common law deemed such circumstances to negate the malice required for murder. Involved is a concession to the frailty of man, a recognition that the average

---

THE COURT: Well now, Mrs. Guido, you were man and wife. Did you consent and have biological relations with your husband? Did you or didn't you?

THE WITNESS: I did not consent, but I did.

THE COURT: Mrs. Guido, you were man and wife. Did you perform the biological act with your husband? Yes or no?"

Defendant's meaning was perfectly plain. The court's questions were objectionable.

The final incident to which we will refer began this way during cross-examination of defendant:

"Q. And you had had no sexual relations with anyone but your husband during the month of April and the month of March, of 1961? A. Not at any time during my entire life.

Q. Not at any time during your entire life?

THE COURT: You mean to say that you were not intimate with your husband before marriage?

THE WITNESS: He was the only man I have ever been intimate with.

THE COURT: Well then, you want to correct your testimony to that extent, don't you?

THE WITNESS: He didn't ask me that.

THE COURT: Ma'am, I am trying to help you, not to hurt you."

Again the witness's meaning was thoroughly plain and there was nothing to correct. Nonetheless and over counsel's protest the court pressed its examination page after page and rehashed the testimony defendant had already given with respect to her premarital cohabitation with the deceased.

person can understandably react violently to a sufficient wrong and hence some lesser punishment is appropriate. See *State v. Williams*, 29 *N. J.* 27, 42–43 (1959).

Here defendant did not point to any specific event as the provocative one.[3] Rather she claimed a course of ill treatment and oppression which closed in upon her so completely that her own death appeared for a while to be the only way out. Within that course of conduct were incidents which could have constituted provocation but none in fact had evoked a homicidal response when it occurred. As indicated above, the conventional statement would exclude a claim of manslaughter if the elapsed time were sufficient for a reasonable man to cool off. Thus, assuming defendant did experience a burst of emotion which overwhelmed her reason, the question is whether a course of conduct such as we have described can legally suffice as provocation.

Homicides are divided into categories to the end that the authorized punishment will reflect the magnitude of the wrong. In the nature of the subject, these categories cannot be perfectly designed, and so a particular set of facts falling within the definition of second-degree murder may be thought less culpable than a factual pattern within the category manslaughter. Nonetheless the sentence may match the offense and the offender, since although the maximum term for second-degree is 30 years and for manslaughter 10 years, *N. J. S.* 2A:113–4 and 5, a lesser sentence may be ordered upon a verdict in the higher degree.

Hence the question is not whether there are circumstances of mitigating quality but whether, in the light of our statutory scheme,[4] the factual pattern comes fairly within the

---

[3] Defendant did testify that during the final evening she submitted, against her desire, to her husband's sexual advances, but the testimony does not suggest the experience was attended by force.

[4] We note that the *Model Penal Code* § 210.3 proposes that criminal homicide constitute manslaughter when:

"(b) a homicide which would otherwise be murder is committed under the influence of extreme mental or emotional disturbance for which there is reasonable explanation or excuse. The reasonableness

concept of manslaughter. We think it does. It seems to us that a course of ill treatment which can induce a homicidal response in a person of ordinary firmness and which the accused reasonably believes is likely to continue, should permit a finding of provocation. In taking this view, we merely acknowledge the undoubted capacity of events to accumulate a detonating force, no different from that of a single blow or injury. The question is simply one of fact, whether the accused did, because of such prolonged oppression and the prospect of its continuance, experience a sudden episode of emotional distress which overwhelmed her reason, and whether, if she did, she killed because of it and before there had passed time reasonably sufficient for her emotions to yield to reason.

Upon this view, we believe the testimony required the issue of manslaughter to be sent to the jury. The defendant's state of mind could have been described more fully. Perhaps it was not because some doubt arose at the trial with respect to whether she could testify as to her thoughts and feelings. Such testimony is, of course, proper. *State v. Abbott*, 36 *N. J.* 63, 79 (1961).

The judgment is reversed and the matter remanded for retrial.

*For reversal* — Chief Justice WEINTRAUB, and Justices JACOBS, FRANCIS, PROCTOR, HALL and SCHETTINO—6.

*For affirmance*—None.

---

of such explanation or excuse shall be determined from the viewpoint of a person in the actor's situation under the circumstances as he believes them to be."

But, as the comments in *Tentative Draft No. 9* (May 8, 1959) reveal, the quoted conception of manslaughter is part of another approach to homicide in which there is no provision for degrees of murder and in which manslaughter is designed to include part of what our Legislature has called murder in the second degree.