**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0551-17T4

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

STEPHEN L. COPELAND, a/k/a
STEPHEN L. COPPELAND,
STEVEN COPELAND, STEPHAN
COPELAND and RAYCHON
SAMUELS,

     Defendant-Appellant.

_____

Submitted February 13, 2020 – Decided April 24, 2020

Before Judges Nugent, Suter and DeAlmeida.

On appeal from the Superior Court of New Jersey, Law Division, Mercer County, Indictment No. 14-08-0964.

Joseph E. Krakora, Public Defender, attorney for appellant (Stefan Van Jura, Assistant Deputy Public Defender, of counsel and on the brief).

Angelo J. Onofri, Mercer County Prosecutor, attorney for respondent (Laura C. Sunyak, Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

Defendant, Stephen L. Copeland, appeals from a judgment of conviction entered after a jury found him guilty of robbery, aggravated assault, and two weapons offenses, and a judge sentenced him to an aggregate forty-year prison term. Because the trial court's cross-examination of defendant on the testimony central to his defense deprived defendant of a fair trial, we reverse and remand for a new trial.

## I.

### A.

In 2014, a Mercer County grand jury returned an indictment against defendant after hearing evidence he shot and robbed a man. The indictment charged defendant with five offenses: first-degree attempted murder, N.J.S.A. 2C:11-3 and N.J.S.A. 2C:5-1 (count one); second-degree aggravated assault, N.J.S.A. 2C:12-1(b)(1) (count two); first-degree robbery, N.J.S.A. 2C:15-1(a) (count three); second-degree possession of a firearm, a handgun, for an unlawful purpose, N.J.S.A. 2C:39-4(a) (count four); and second-degree unlawful possession of a handgun, N.J.S.A. 2C:39-5(b) (count five).

The court heard two pre-trial motions, one filed by defendant, one filed by the State. Defendant moved to suppress the victim's out-of-court

2

identification of him as the robber. The State moved to admit at trial the video recorded statement defendant gave to detectives. Following a Wade[1] hearing, the court denied defendant's motion. Following a Miranda[2] hearing, the court granted the State's motion, subject to certain redactions.

The jury acquitted defendant of count one, attempted murder, and convicted him of the remaining counts, aggravated assault, robbery, and the two weapons offenses. The trial court granted the State's motion to sentence defendant to an extended term as a persistent offender under N.J.S.A. 2C:44-3(a).

During the sentencing proceeding, the court merged the indictment's second count, aggravated assault, and the indictment's fourth count, possession of a weapon for an unlawful purpose, with the third count, robbery. The court sentenced defendant on the third count, first-degree robbery, to an extended forty-year prison term subject to the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2. On the fifth count, second-degree unlawful possession of a weapon, the court sentenced defendant to a concurrent ten-year prison term with five

---

[1]  United States v. Wade, 388 U.S. 218 (1967).

[2]  Miranda v. Arizona, 384 U.S. 436 (1966).

A-0551-17T4

years of parole ineligibility. The court also imposed required fines, penalties, and assessments.

## B.

The trial record includes the following facts. Early on a January morning in 2014 in Trenton, Police Officer Michael Tradigo responded to the report of a shooting in progress and found Ralph Anderson, who had been shot, lying on the ground at a Shell Mini Mart gas station. After an ambulance left with Anderson for the hospital, Officer Tradigo searched the area. He found five nine-millimeter shell casings on the ground near where Anderson had been shot. Ballistics analysis established the shell casings were all fired from the same gun. No fingerprints were found on the shell casings. Later, ballistics analysis established that two projectiles recovered from Anderson during his hospital treatment were .38 caliber bullets. These bullets could have been fired from one of four handguns: a nine-millimeter, a .380 caliber, a .38 special, or a .357 magnum.

Trenton Police Detective Michael Nazario was unable to speak with Anderson on the morning of the shooting. Anderson had been shot four times, twice in the stomach, twice in the left arm. One bullet severed his spinal cord, paralyzing him from the waist down. Detective Nazario drove from the hospital

to the Mini Mart and interviewed four people who had been at or near the shooting scene when it occurred. None could identify the shooter. He learned, however, the Mini Mart had surveillance cameras inside the Mini Mart and at the gas pumps. He obtained the relevant segments of the surveillance video.

Six days later, another Trenton Police Department detective, Brian Jones, watched the surveillance footage and recognized three men from his "duties as a police officer." The three men were the shooting victim, Anderson, Dyvonte Signal, and defendant. During the trial, as the prosecutor played and paused the video for the jury, Detective Jones identified people and explained certain events depicted in the inside and outside surveillance video footage.

According to the time depicted on the video taken inside the Mini Mart, Anderson entered at 5:21:19. Defendant entered three minutes later. He wore a red and black jacket with a white North Face logo, black pants, red shoes, and a gold watch on his right wrist. His dreadlocks were gold-tipped. Neither Anderson nor Dyvonte Signal, who later entered the store, were similarly dressed. Defendant and the victim appeared to converse, and at one point defendant stuck his hands in his jacket pockets. Anderson appeared to respond by lifting his arms and moving his hands in circular motions. Defendant then walked to the back of the store and later left at 5:29:15, slightly less than five

minutes after he had entered.  He entered a black vehicle and drove away with the same men who were with him when he arrived.

Meanwhile, Dyvonte Signal entered the Mini Mart approximately two minutes before defendant left.  He remained in the store when Anderson left and was inside when Anderson was shot minutes later.

Anderson left the store and stood outside, talking with an unidentified person.  Approximately six minutes later, a man approached Anderson.  The man's face is blurred in the video.  He wore a red and black jacket with a white North Face logo, black pants, and red sneakers.  He had gold-tipped dreadlocks. He lifted his left arm, pointed toward Anderson, and appeared to fire three shots. Anderson fell.  The shooter leaned over Anderson and with his right hand—a gold watch visible on the wrist—removed something from Anderson's pocket. The man fired another shot at Anderson, causing him to roll backward.  The video of the Mini Mart's interior shows Dyvonte Signal, still inside the store, apparently yelling for help.

Four days after first watching the surveillance video, Detective Jones interviewed defendant.  At trial, the State played the video of defendant's interview.  After acknowledging his Miranda rights, signing a waiver form with his left hand, and agreeing to speak to the detective, defendant identified a still

6

photo of himself taken from the inside surveillance camera at the Mini Mart on the morning of the shooting. Defendant admitted he was wearing a red and black North Face jacket and red shoes but denied shooting anyone. Defendant said he did not know Anderson, denied speaking to him that night, and claimed he had no reason to shoot Anderson.

Defendant claimed his cousin, Dyvonte Signal, shot Anderson after they had "words" in the Mini Mart. Defendant said Dyvonte, who had black and gold-tipped dreadlocks tucked under his hood and who was initially wearing a black jacket, asked to borrow defendant's jacket and shoes. Defendant agreed and they switched clothes after they left the Mini Mart. Defendant insisted that if detectives checked the surveillance video from a store not far from the Mini Mart, they would see that he had exchanged his clothes for a green North Face jacket and a different pair of sneakers.

When Detective Jones told defendant the video showed Dyvonte in the store when the shooting occurred, defendant responded, "Oh my god," admitted that Dyvonte might not be the shooter, but also said the man in the store when the shooting occurred might not be Dyvonte. Defendant changed his hair after the shooting, but said he did so because he saw "that man do that man" and did not want to look like Dyvonte.

Police did not take a formal statement from Anderson until after he pled guilty in February 2016 to second-degree unlawful possession of a handgun. As part of his plea bargain, Anderson agreed to testify truthfully at defendant's trial in exchange for the State recommending a probationary sentence. In a statement recorded a month after he pled guilty, Anderson told detectives a man he knew as "Tek" shot him four times in front of the Mini Mart, reached into his pocket, took five dollars, then shot him again. Anderson could not recall what Tek was wearing but said he would be able to identify a photograph of Tek because he knew Tek and Tek's family from the Walnut Street area.

Mercer County Prosecutor's Detective Karen Mendez showed Anderson a photograph of defendant that had been published in The Trentonian, a local newspaper, following defendant's arrest. Anderson had seen the photograph during his lengthy period of rehabilitation when his mother showed him the newspaper article about defendant's arrest. When Detective Mendez showed Anderson defendant's photograph during a March 2016 interview, Anderson immediately and unequivocally identified the photograph as that of the person who shot him.

During defendant's trial, Anderson identified defendant as the man who shot him. Anderson testified he had never spoken to defendant before the

8

shooting but had seen him on Walnut and Chestnut Streets "way more than ten times." He also knew defendant's family, who lived in the area, "real well."

Anderson told the jury he went to the Mini Mart on the morning of the shooting to look for his cousin's boyfriend. While speaking to a friend in the Mini Mart, defendant entered the store. According to Anderson, defendant was wearing a hoodie and black jeans, with "dreads . . . hanging down." Anderson did not speak to defendant, but clearly saw his face. Defendant left the store after approximately five minutes.

Anderson left a few minutes later. While standing outside talking to "some kid," defendant "rolled up" on him and shot him four times at close range. He fell to the ground. Defendant was not wearing a mask, and looked the same as he did when Anderson saw him in the Mini Mart. Defendant went through Anderson's pockets and took five dollars. Anderson passed out and had no memory of being taken to the hospital.

Defendant testified and denied shooting Anderson. He admitted that before the shooting he had attended a "red and black" party and then had driven to the Mini Mart with a friend, who owned a black BMW. Defendant identified himself in the Mini Mart surveillance footage and admitted he was wearing a red and black North Face jacket, black jeans, expensive red shoes, and a Casio

9

gold watch on his right wrist. He also admitted he had gold-tipped dreadlocks and was left-handed. He acknowledged speaking with several people in the Mini Mart, including Anderson, but denied being frustrated or "ha[ving] words" with Anderson.

Defendant said that while he was in the store, his cousin, Dyvonte, asked to borrow his jacket and shoes and suggested defendant leave the clothes at Dyvonte's home. Defendant agreed, explaining Dyvonte could not afford the Mauri shoes defendant wore. Defendant left the store, entered his friend's BMW, and drove to Dyvonte's home. He entered through an unlocked door, left his jacket and red shoes, and took a green North Face jacket and sneakers from a rack in the hallway. He and his friend drove to defendant's grandmother's house, "around the corner" from the Mini Mart, where they later heard gunshots.

During cross-examination, defendant explained he had told Detective Jones that Dyvonte was the shooter based on what he heard "through the streets" and "in the neighborhood." He also acknowledged saying he had removed the gold tips from his hair shortly after the shooting because he did not want to look like Dyvonte, who also had gold-tipped dreadlocks, and did not "want to get caught up in nothing." He admitted, however, Dyvonte could not have been the shooter because when the shooting occurred Dyvonte was inside the Mini Mart

10

and was wearing black clothes, unlike the shooter, who was wearing a red and black jacket and red shoes.

At the conclusion of the prosecutor's cross-examination, the judge questioned defendant:

> [The Court]: Why did you give your jacket and these expensive shoes to your cousin?
>
>    . . . .
>
> [Defendant]: He asked me. . . . He asked me at the door.
>
> [The Court]: I heard that, but why did you do it?
>
> [Defendant]: Because he's my cousin, he's my family. It doesn't matter. It's clothing. I'm not thinking he going to go do some wild stuff like this. I'm not -- that's the farthest thing from my mind.
>
> [The Court]: I'm just asking why you did it. You said it was expensive stuff, you work hard for a living, you have three kids at home. Why did you just give up all this expensive stuff just because he asked you?
>
> [Defendant]: Because . . . it doesn't matter. It doesn't matter.
>
> [The Court]: It doesn't matter.
>
> [Defendant]: It's clothes.
>
> [The Court]: Why did you do it at that moment in time?

11

[Defendant]: Because it's just -- because I didn't feel like coming back over there. I'm going all the way out North Trenton.

. . . .

[Defendant]: I'm going to my grandmother's house then I'm going to North Trenton. I'm not going all the way back over there.

[The Court]: Why did you give your cousin's name up to the detective when you were talking to him?

. . . .

[Defendant]: Because my kids come before everything. My kids, my wife, my job, everything. My immediate family.

[The Court]: Why did you say your cousin was the one?

[Defendant]: Because he's the person that I gave these things to. I left these things in his -- in his possession.

[The Court]: What did you hear about what the shooter looked like, was wearing from the community?

. . . .

[Defendant]: I heard in the neighborhood that -- well, all around, all around like Wilbur Section that Dyvonte committed this crime. The only person that had these color clothing, because the owner up here he talks to everybody in the store. As you can see everybody's in the store up here. It's not no you go in the store and you go leave out. No. That's not what this store is. This store is a community store. It's been around for a very long time as well as the other stores in the community. So, he's telling people that we don't know

12

what's going on, but it could be this person or that person. But it's a person in red right here. You see red right here. So I don't know. The only person that I know that had that color on last night was two people, myself inside the store, Shells. Dyvonte asked me for these things. I left them with Dyvonte. The only thing that I could come up with at the time when I'm speaking with Detective Jones –

[The Court]: When you say come up with, what do you mean by come up?

[Defendant]: The only thing that I could put together. If you put one plus one make two. If -- I did not shoot this man and I go over here to this man['s] house and leave these clothing -- leave this clothing here and then I leave and then I hear from somebody else that he committed this crime and they're saying a person in red and black and Detective Jones shows me a picture of a person in red and black the first thing I'm thinking about is Dyvonte. What you trying to take me away from my kids? You want me here?

[The Court]: If Dyvonte had no gold tips on the front of his hair why did you eliminate the gold tips from your hair?

[Defendant]: I always change the color of my hair.

[The Court]: So this was happenstance? How often do you change your hair?

[Defendant]: Whenever my girl feel like doing it. Whenever she feel like doing it.

[The Court]: How often do you do it is the question? Weekly, or daily?

13

[Defendant]: I wouldn't say weekly. I would probably say about –

[The Court]: It just happened that it fell into that week.

[Defendant]: Yeah, it just happened. Yeah.

Following redirect examination, the court questioned defendant without objection:

[The Court]: But that just occurred to me, were there people around who saw you go into your cousin's house wearing red and coming out wearing green?

. . . .

[Defendant]: Only Shells. Shells was there because he waited for me outside until I came back and got in the car.

[The Court]: So, there were people around. There were people around.

[Defendant]: Yeah.

Defendant did not object to the court's interrogation of defendant.

II.

On this appeal, defendant argues the following points:

POINT I

THE CONVICTIONS SHOULD BE REVERSED BECAUSE DEFENDANT WAS DENIED HIS RIGHTS TO DUE PROCESS AND A FAIR TRIAL BY THE TRIAL COURT'S REFUSAL TO ISSUE AN

14

IDENTIFICATION JURY INSTRUCTION DESPITE THE CENTRALITY OF IDENTIFICATION TO THE CASE.

POINT II

THE CONVICTIONS SHOULD BE REVERSED BECAUSE DEFENDANT WAS DENIED HIS RIGHTS TO DUE PROCESS AND A FAIR TRIAL BY THE TRIAL COURT'S CROSS-EXAMINATION OF DEFENDANT, WHICH CLEARLY SIGNALED TO THE JURY THE COURT'S DISBELIEF OF DEFENDANT'S TESTIMONY ON HIS SOLE DEFENSE.

POINT III

THE CONVICTIONS SHOULD BE REVERSED BECAUSE DEFENDANT WAS DENIED DUE PROCESS OF LAW BY THE INTRODUCTION INTO EVIDENCE OF A PHOTOGRAPHIC IDENTIFICATION THAT WAS SO IMPERMISSIBLY SUGGESTIVE AS TO GIVE RISE TO A VERY SUBSTANTIAL LIKELIHOOD OF IRREPARABLE MISIDENTIFICATION.

POINT IV

THE EXTENDED-TERM NERA SENTENCE WAS MANIFESTLY EXCESSIVE AND SHOULD BE REDUCED.  (Not Raised Below).

The New Jersey Rules of Evidence authorize judges, "in accordance with law and subject to the right of a party to make timely objection," to "interrogate any witness."  N.J.R.E. 614.  Our Supreme Court has "recognized that the

15

discretionary power of a judge to participate in the development of proof is of 'high value.'" State v. Ross, 229 N.J. 389, 408 (2017) (quoting State v. Guido, 40 N.J. 191, 207 (1963)). The judge "may intervene to expedite the proceedings and clarify testimony," and "to help elicit facts from a witness who is in severe distress." Ibid.

Yet, "a judge must exercise this authority with 'great restraint,' especially during a jury trial." Ibid. (quoting State v. Taffaro, 195 N.J. 442, 451 (2008)). "A judge must use considerable care when questioning witnesses to avoid influencing the jury." Ibid. That is so because "[t]here is a grave risk that a trial court may influence a jury through its questioning by signaling doubt about a witness's credibility or suggesting that it favors one side over the other." Ibid.

"A fine line separates proper and improper judicial questioning. A trial court crosses this line when its inquiries give the jury an impression that it takes one party's side or that it believes one version of an event and not another." Id. at 409. In determining whether a trial judge has crossed over this line, an Appellate Court "must examine the record as a whole." Ibid.

For example, in Taffaro, the trial judge asked the defendant more than thirty questions, without objection, in a manner that "underscored the weaknesses in his defense," and "neither redressed the tactics of the parties nor

helped expedite the trial." 195 N.J. at 448, 452. The Court concluded the judge's conduct constituted plain error, explaining that the questions "had the effect of suggesting to the jury that the court doubted defendant's account in a case that rested heavily on defendant's credibility." Id. at 453-54. "While defendant's answers may have been hard to believe, that issue was for the jury alone to decide." Id. at 452. "In light of the trial judge's esteemed position in the courtroom and the central role that defendant's credibility played in this trial, suggesting disbelief of defendant's testimony could well have had a critical impact on the verdict." Id. at 454. Moreover, the jury instruction was not "sufficient to cure the harm." Ibid.

We reach the same conclusion in this case. Here, the trial court asked defendant fifteen questions that bore into the core of the defense, suggesting the incredulity of defendant giving up expensive clothing merely because someone made a request for the clothes, and the irony of the timing of his doing so. The trial court's questions highlighted the inconsistency between defendant telling detectives he removed the gold tips from his dreadlocks because Dyvonte had gold-tipped dreadlocks, and his trial testimony—in the face of evidence Dyvonte had no gold-tipped dreadlocks—that he "always change[d] the color of [his] hair." The trial court characterized defendant's trial answer as an assertion that

the change was "happenstance" and noted "[i]t just happened that it fell into that week." The court also noted "there were people around" when defendant went into Dyvonte's house to change clothes, implicitly raising the question of why no one was called as a witness to corroborate defendant's story.

Like the Taffaro Court, 195 N.J. at 454, we too find the jury instructions here were insufficient to cure the harm. In fact, the instructions may have exacerbated the trial court's error in interrogating defendant in the manner it did. The trial court did not instruct the jury, in accord with the Model Jury Charge, that "[t]he fact that I asked such questions does not indicate that I hold any opinion one way or the other as to the testimony given by the witness." Model Jury Charges (Criminal), "Criminal Final Charge" (rev. May 12, 2014). Instead, the judge instructed the jury without objection that:

> I ask questions from time to time, not a lot. I try not to do that. The attorneys should be trying the case, not me. But the fact that I ask a question should not be an indicator. Ah-ha, that's the key to this case. That's why he asked the question. No, often I don't hear something that's said or I don't think you do. I'm looking at your faces and I know how low some of these things are, how fast some people talk, and it's hard to pick it up. And all of you don't raise hands because you didn't hear it. I don't think anybody raises hands anymore, but all right. But I look at you and I want to make sure you get it. That's why I tell the witnesses to keep their voice up, to direct it to you. It's important and so forth.

Sometimes I can ask a question to followup [sic]. You can't, I can. I do that, but I try to be careful in what I do ask. But it's generally because I think you're all thinking what about, can you ask that question? So I'm second guessing to some extent of what I think you're thinking about, and I can ask a question. But it doesn't mean it has any greater significance, either the question or the answer than anything else.

The record does not suggest the court interrogated defendant, after his direct and cross-examination, because it thought defendant had dropped his voice or the jury did not hear his testimony. This part of the court's jury instruction did nothing to dispel the court's belief that defendant's testimony was incredulous, a belief evident from the court's questions.

Nor did the court give the model jury charge that his rulings were "not an expression or opinion by me on the merits of the case. Neither should my other rulings on any other aspect of the trial be taken as favoring one side or the other." Model Jury Charges (Criminal), "Criminal Final Charge" (rev. May 12, 2014). Instead, the judge's instruction may have actually underscored his disbelief of defendant, in that he instructed the jury without objection that:

During the trial, there were rulings that were made from time to time in your presence. Any ruling I made is made with the desire to do it promptly, but to do it fairly and impartially. And I'm only focusing on that issue that is before me now, an objection as to something, I'll rule and we move on.

19

But don't think that I have a feeling one way or the another [sic] as to how you should decide the case. That would be highly improper. So I really do take pains not to make facial expressions or act in any way that would show partiality to one side or another. I mean, I've heard the case now, too. I have some very strong feelings about the case, but they're mine. But you're the jury in this case, [twelve] of you are going to decide it. I am not.

[(Emphasis added)].

The court's declaration it had very strong feelings about the case, coupled with its interrogation of defendant, telegraphed its "strong feelings" about defendant's guilt.

The State points out defendant did not object to the court's questioning of him, so defendant's argument must be evaluated under a plain error standard, that is, the alleged error must have been clearly capable of producing an unjust result. R. 2:10-2. The State argues "defendant's testimony here was so obviously fabricated that the judge's questioning could not have affected the outcome."

The Sixth Amendment of the United States Constitution and Article I, paragraph 10 of the New Jersey Constitution guarantee that "everyone charged with [a] crime has an absolute constitutional right to a fair trial in an atmosphere of judicial calm, before an impartial judge and an unprejudiced jury." State v.

Tyler, 176 N.J. 171, 181 (2003) (alteration in original) (quoting State v. Marchand, 31 N.J. 223, 232 (1959)).  In addition,

> [t]he United States Supreme Court has delineated a few "constitutional rights so basic to a fair trial that their infraction can never be treated as harmless error." Chapman v. California, 386 U.S. 18, 23 (1967).  See e.g. Payne v. Arkansas, 356 U.S. 560 (1958) (coerced confession); Gideon v. Wainwright, 372 U.S. 335 (1963) (right to counsel); Tumey v. Ohio, 273 U.S. 510 (1927) (impartial judge).
>
> [State v. McCloskey, 90 N.J. 18, 30 (1982) (emphasis added).]

The nature of the trial court's questioning of defendant in the case now before us, coupled with the court's declaration it had very strong feelings about the case, conveyed its partiality.  The court's disbelief of defendant's testimony was understandable, its very strong feelings about the case perhaps well-founded, but the court should not have permitted these personal assessments and sensibilities to negate its neutrality or impair its impartiality.  Permitting these deviations deprived defendant of a fair trial, an infraction that can never be treated as harmless error.  Chapman, 386 U.S. at 23.  Accordingly, we reverse and remand for a new trial.

III.

21

Defendant also argues the trial court erred when it denied his motion to suppress Anderson's out-of-court identification of the photograph of defendant. The court denied the motion following a hearing at which Detective Mendez and Anderson gave testimony, consistent with but more detailed than their trial testimony. Following the hearing, the court denied defendant's motion. The court found, among other facts, Anderson "clearly knew" defendant and had identified him "very confidently," and "calmly and with great ease." The court found this was "more of a confirmatory procedure."

The trial court's findings are "entitled to very considerable weight." State v. Adams, 194 N.J. 186, 203 (2008) (quoting State v. Farrow, 61 N.J. 434, 451 (1972)). Here, the trial court's findings are amply supported by the record. In view of Anderson's testimony that he knew who defendant was well before the shooting, defendant could not and did not carry his "ultimate burden . . . to prove a very substantial likelihood of irreparable misidentification," his argument to the contrary notwithstanding. State v. Henderson, 208 N.J. 208, 289 (2011).

In any event, the record amply supports the trial court's determination that Anderson's out-of-court identification of defendant's photograph was a confirmatory identification. "A confirmatory identification occurs when a witness identifies someone he or she knows from before but cannot identify by

name." State v. Pressley, 232 N.J. 587, 592-93 (2018). Confirmatory identifications are not considered suggestive. Id. at 592.

Defendant also argues the trial court committed reversible error by omitting an identification charge in its instructions to the jury. In view of our reversal and remand for a new trial on other grounds, we need not address the State's argument the court's omission did not constitute plain error.

"When eyewitness identification is a 'key issue,' the trial court must instruct the jury how to assess the evidence—even if defendant does not request the charge." State v. Sanchez-Medina, 231 N.J. 452, 466 (2018) (quoting State v. Cotto, 182 N.J. 316, 325 (2005)). Identification is a "key issue" when it is the "major, if not the sole, thrust of the defense," State v. Green, 86 N.J. 281, 291 (1981), "particularly in cases where the State relies on a single victim-eyewitness. . . ." Cotto, 182 N.J. at 325. The failure to give such a charge "is most often reversible error." State v. Davis, 363 N.J. Super. 556, 561 (App. Div. 2003). The trial court shall instruct the jury on identification at defendant's retrial.

In view of our disposition of this appeal, we need not address defendant's argument concerning his sentence.

Reversed and remanded for a new trial.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0551-17T4