984 A.2d 879

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT, v.
PETER J. O'BRIEN, DEFENDANT–APPELLANT.

Argued September 15, 2009—Decided December 29, 2009.

*Jay L. Wilensky,* Assistant Deputy Public Defender, argued the cause for appellant (*Yvonne Smith Segars,* Public Defender, attorney).

*Samuel J. Marzarella,* Supervising Assistant Prosecutor, argued the cause for respondent (*Marlene Lynch Ford,* Ocean County Prosecutor, attorney; *Mr. Marzarella* and *Patricia S. Torcki,* Assistant Prosecutor, on the briefs).

Justice LONG delivered the opinion of the Court.

Recently, in *State v. Taffaro,* 195 *N.J.* 442, 451, 950 *A.2d* 860 (2008), we reaffirmed the well-established principle that, in presiding over a jury trial, the judge, who holds a powerful symbolic position vis-à-vis jurors, must maintain a mien of impartiality and must refrain from any action that would suggest that he favors one side over the other, or has a view regarding the credibility of a party or a witness.

It is against that backdrop that we review this case in which the Appellate Division affirmed defendant's conviction for the first-degree murder of his parents. At trial, defendant did not contest the fact he killed his parents; his sole defense was diminished capacity, which was to be proved through his testimony about his drug consumption and depression, and that of his expert psychiatrist. During the trial, the trial judge injected himself into the case by questioning witnesses, including defendant and his expert. Because that questioning made it seem as though the judge did not credit the proffered defense, it denied defendant a fair trial.

## I.

On June 29, 2004, defendant Peter O'Brien was indicted by an Ocean County Grand Jury and charged with two counts of murder in the first degree, *N.J.S.A.* 2C:11–3a(1), two counts of second-degree possession of a firearm for an unlawful purpose, *N.J.S.A.* 2C:39–4a, third-degree unlawful possession of a weapon, *N.J.S.A.* 2C:39–5b, and third-degree theft by unlawful taking, *N.J.S.A.* 2C:20–3.

A trial ensued at which many of the facts were uncontroverted. Included were the following: defendant stole approximately $40,000 from his parents [1] while they were away in Florida. On May 7, 2004, defendant picked up his parents at Newark Airport on their return from Florida and drove them to their home in Toms River. After assisting them with their luggage, defendant went into his bedroom, retrieved a loaded handgun that he had taken from Mr. Napoleon's filing cabinet and a pillow, proceeded into Mr. Napoleon's office and shot him from behind several times at close range. Defendant's mother was in the bathroom when she heard the shots. When she walked out of the bathroom to see what was happening, defendant shot her twice at close range.

Defendant put the gun and pillow into his car and went back into the house where he saw Mr. Napoleon on the floor with a cordless telephone in his hand. Defendant took the telephone and placed it back on the receiver. Mr. Napoleon looked at defendant and said "I love you." Defendant responded "I love you too" and then left the house. Mr. Napoleon managed to find another telephone and called 9–1–1, reported the shootings and implicated defendant as the shooter. When police arrived on the scene, Ms. O'Brien was found dead in the house and Mr. Napoleon was found

---

[1] Josephine O'Brien, defendant's mother, resided with her boyfriend, Anthony Napoleon, and defendant considered Napoleon to be his "stepfather." Thus, O'Brien and Napoleon were referred to collectively as defendant's parents during the trial.

alive, outside of the house, near the curb. Mr. Napoleon was taken to the hospital, where he was pronounced dead.

When defendant left the family home he went to a local shopping plaza where he put the gun, pillow, and the shirt he had been wearing into a dumpster. After disposing of the evidence, defendant met friends and went to McDonald's, where he was initially contacted on his cell phone by police.

Subsequently, defendant and a female friend went to the Dover Township Police Headquarters where they were met by Detective Thievon of the Dover police force. Detective Thievon escorted defendant and his friend into an interview room and collected basic information from each of them. Detective Thievon left when Detective Bajada of the Dover Township Police Department and Investigator Mitchell of the Ocean County Prosecutor's Office arrived to conduct a formal interview. Defendant appeared upset when the detective and investigator arrived at the interview room. Prior to beginning the interview, defendant was advised of his *Miranda*[2] rights, which he waived. Investigator Mitchell told defendant that the police were in possession of a 9-1-1 tape on which Mr. Napoleon implicated him in the homicides. Defendant was silent for approximately thirty seconds then said "I did it." He later made a full confession that was introduced at trial and was the source of many of the aforecited facts.

At trial, defendant advanced a diminished capacity defense based on his drug intoxication and depression. In support of that defense, defendant testified about his long-term drug use and depressed mental state. He did not contest that he killed his parents, but testified that he could not remember shooting them or making a confession. He also presented an expert witness, Dr. John Verdon, a psychiatrist concentrating in addiction medicine, who opined that defendant's drug intoxication and depression impacted on his ability to act knowingly or purposefully.

---

[2] *Miranda v. Arizona*, 384 *U.S.* 436, 86 *S.Ct.* 1602, 16 *L.Ed.*2d 694 (1966).

It was in connection with that defense that the judge engaged in direct questioning of defendant and his expert witness. At the close of defendant's lengthy testimony, the judge questioned him regarding his lack of memory about the incidents surrounding the shooting—a matter which already had been explored extensively and repeatedly during direct, cross, and redirect examination of the witness:

THE COURT: I have a question just for clarity. Is it your testimony here that *you remember taking the phone and hanging it up?*

WITNESS: I just remember hanging it up. I don't remember taking the phone.

THE COURT: *And you remember Mr. Napoleon saying words to you?*

WITNESS: Yes.

THE COURT: *And you remember saying words back to him?*

WITNESS: Yes.

THE COURT: *And you remember that today?*

WITNESS: Yes.

THE COURT: *And you remembered that when you spoke to the police?*

WITNESS: I don't know.

THE COURT: Okay. *But everything else from the time you went into the house and took the luggage in, until you were in the police station, you don't remember?*

WITNESS: Correct.

THE COURT: *But you remember taking the phone?*

WITNESS: I remember hanging the phone up.

THE COURT: *And you remember Mr. Napoleon saying those words* ["I love you"] *to you?*

WITNESS: Yes.

THE COURT: *And you saying those words to him?*

WITNESS: Yes.

[(Emphasis added).]

At that point, the judge reminded the jury that it was "not to glean anything from my question or give any more weight to my questions." [3]

---

[3] Six days earlier, when the judge questioned Detective Thievon, he issued the following instruction:

Ladies and gentlemen, every once and [sic] awhile, I ask some questions. You can't put any more importance into the questions that I ask than

The judge also interjected himself into the proceeding during the direct examination of Dr. Verdon. Dr. Verdon testified that defendant had a marijuana addiction, and that he also abused other mood-altering substances, such as cocaine, prescription pain-killers, and alcohol. According to Dr. Verdon, defendant's drug use caused him to experience depression and "profound memory loss." The judge then lasered in on Dr. Verdon's testimony in connection with defendant's claim at trial that he had some memory of the encounter with his father:

THE COURT: Excuse me.

WITNESS: Sure.

THE COURT: *Did you just say that when he spoke to you, Mr. O'Brien spoke to you during your interview, that he had no memory of the encounter with Mr. Napoleon, and what Mr. Napoleon said to him and he said to Mr. Napoleon?*

WITNESS: He knew it was in the record, but as far as his—it's all vague at that point, your Honor.

THE COURT: I understand. I understand he knew it was in the record by this point in time.

WITNESS: Right.

THE COURT: *My question is did he tell you that* absent what was in the record, *he had no recollection and did not remember that?*

WITNESS: He didn't say it specifically. It was all a blur to him, it was all vague, and it felt unreal, so I didn't ask the specific question to him. [w]hat do you actually recall of that part of it? I didn't ask him that, your Honor, so I can't answer that.

---

questions asked by counsel. When I ask questions, you're not to think that it's indicative of any opinion by the Court as to how the case should be decided or as to the merits of the testimony or the credibility of the testimony. The law doesn't allow me to have an opinion one way or the other.

I want you to understand that I ask questions for your benefit. Hopefully, my questions maybe are beneficial in eliciting information that's helpful to you. If it's not helpful, and you say, [w]ell, that's a stupid question the judge asked, I didn't need to know that, disregard it. But if you find that it's helpful, then you can use it.

But you can't add any special significance to questions that are asked by me. . [Y]ou are the sole judges of the facts, and you cannot add any extra weight or import because I asked the question. Okay?

THE COURT: Did you glean from your interview with him that when he was speaking about that part of it, that he was doing it from his memory? *Did he say, I remember this part?*

WITNESS: No, no. It wasn't from his current memory then, because when I met with him a year later, he had very little direct recall. But he could recall with me, because I went over the statement with him, and he said, "No, I was not"—in talking to me, he said, "I was not in the office. I was in the hallway." And he was in the office, so that—

THE COURT: We're talking about the time when he hung up the phone.

WITNESS: Yeah, I know that. I'm saying that part he—I don't have detail about him specifically recalling. That was all after the event.

THE COURT: *Would you have noted in your notes if he told you that he had a specific recall, a present recall, at the time you interviewed him, of that encounter when he hung the phone up?*

WITNESS: Yes, indeed, your Honor.

THE COURT: *You would have put that down?*

WITNESS: Yes, yes.

THE COURT: *And you didn't put that down?*

WITNESS: No, I didn't.

THE COURT: I'm sorry for interrupting, but—

WITNESS: Thank you, your Honor.

THE COURT:—I thought that needed to be clarified.

WITNESS: Thank you.

|(Emphasis added).]

The judge interrupted Dr. Verdon's testimony a second time when he challenged Dr. Verdon concerning his statements about how long a person can remain under the influence of marijuana and what kinds of physical effects would be palpable hours later:

THE COURT: Before redirect, I have a question.

Earlier, when [the prosecutor] was asking you questions, you were talking about at the time he was reviewing the transcript, when he was initialing the statement.

WITNESS: Yes.

THE COURT: At that time.

*I wrote down this. You said, "At the time of the review of the transcript of his statement, he would have still been under the influence of marijuana at that time."*

WITNESS: Yes.

THE COURT: I believe that was your statement.

WITNESS: Yes, it was.

THE COURT: *How long does someone stay under the influence of marijuana if the last marijuana he smoked was before three o'clock in the afternoon?*

WITNESS: *Well, your Honor, he told me it was about—when he left for the airport, so, in my opinion, 4:30, 5:00, he would still be under the influence.*

THE COURT: *Well, he was at the airport at five o'clock.*

WITNESS: Right.

THE COURT: *And I think we can all agree and take notice of the fact that it takes at least an hour to drive from Toms River, New Jersey, to Newark Airport.*

WITNESS: Right.

THE COURT: *So—at least an hour.*

WITNESS: Right, exactly. Sure.

THE COURT: *So he had to leave—he was there at five o'clock*

WITNESS: Okay.

THE COURT: *He had to leave Toms River at four o'clock.*

WITNESS: Yep.

THE COURT: Fair?

WITNESS: Yeah.

THE COURT: *So it had to be before four o'clock that he said he last smoked marijuana.*

WITNESS: Right.

THE COURT: That's what he told you?

WITNESS: He smoked right before he left.

THE COURT: Just before he left?

WITNESS: Right.

THE COURT: That's what he said.

WITNESS: That's what he said, right.

THE COURT: And that's what you assumed to be true?

WITNESS: Yes.

THE COURT: *Okay. How long after you smoke marijuana do you remain and still under—you said, "He would still have been under the influence of marijuana at the time."*

How long?

WITNESS: *Many hours.*

THE COURT: *How many?*

WITNESS: *Six, seven, eight hours. You don't have—to answer your question, you don't have—you may not have the euphoria, and you smoke again, but it lasts many hours. And people the next day are still burnt out from the use of marijuana. This is not an occasional use.*

THE COURT: *And you call that under the influence?*

WITNESS: Under the influence, yes.

THE COURT: Okay. So even like—I don't smoke marijuana—

WITNESS: I understand.

THE COURT:—so it's difficult for me to understand this.

WITNESS: I understand.

THE COURT: But I do occasionally have an alcoholic beverage.

WITNESS: Right.

THE COURT: *If you're under the influence of alcohol, by your standard, even the next morning, when you're hung over, you're still under the influence. Is that what we're talking about?*

WITNESS: Well, to sort of put the analogy the same, it's—the burnt feeling that cannabis-dependence people talk about would be like that hangover.

THE COURT: All right.

WITNESS: It would be different, but similar.

THE COURT: *And—and in your terminology, as a professional, that's still under the influence?*

WITNESS: No. I would say that's a hangover effect.

THE COURT: *Okay. So it's not under the influence?*

WITNESS: At that point, the next day. But five or six hours later, when he made the statement, he—

THE COURT: *All right. So if he's signing this statement at 10:03 p.m., that's when he was initialing his statement—*

WITNESS: Yes.

THE COURT:—10:03—

WITNESS: Right.

THE COURT:—*he's still under the influence*—

WITNESS: He certainly could have been.

THE COURT:—of marijuana?

WITNESS: He certainly could be.

*And the other thing, your Honor, is although I don't have clear data to support it, given that I've accepted what Mr. O'Brien has said is factual about his use of marijuana—and I acknowledge that may be inaccurate, incorrect, and I may be wrong in that—it is most likely that when he was with his friends at the house and he went over there, that he was [there] smoking marijuana, but I can't document that and prove that.*

PROSECUTOR: I'm going to object to that, your Honor.

WITNESS: I'm responding to your Honor, that's all.

THE COURT: *So what you're doing is you're saying that—you're assuming that even before they went to McDonald's, when he was at his friends house, even though there's no indication in any of the documents that you reviewed—*

WITNESS: That's right.

THE COURT:—*there's no indication in any of the documents that you reviewed that he smoked marijuana after he left for the airport*—

WITNESS: That's right.

THE COURT:—*and he didn't tell you that he smoked marijuana after he went to the airport*—

WITNESS: That's correct.

THE COURT:—*you're assuming, for the purposes of your statement, that he was still under the influence, that he did smoke marijuana?*

WITNESS: *I just want to clarify. The marijuana that he smoked at 4:00[,] 4:30, 3:30, whenever that was, still would be effective with him five hours later or six hours later.*

THE COURT: Thank you.

Ladies and gentlemen, I give you the same admonition that I gave you before about questions that are asked by the Court. I ask them for the sole—I ask these questions for the sole purposes of eliciting information for your benefit.

You are the sole judges of the facts. You may not infer from the fact that the Court asked questions that the Court has any belief or opinion about as to how the case should be decided. The law does not permit the Court to have such an opinion. You are the sole judges of the facts.

[(Emphasis added).]

The judge also questioned two of the State's witnesses, one instance of which bears repeating here. Investigator Mitchell testified on direct examination regarding his experience and his observations of defendant at police headquarters on the day the statement was given:

PROSECUTOR: How long have you been employed by the Ocean County Prosecutor's Office?

WITNESS: Twelve years.

PROSECUTOR: And what is your specific assignment in the prosecutor's office?

WITNESS: I'm assigned to the Major Crime Homicide Unit.

PROSECUTOR: Okay. And how long have you been assigned there?

WITNESS: Eleven years.

PROSECUTOR: Can you tell us, during your eleven years in the Major Crimes Homicide Unit, how many times have you been involved in homicide investigations, approximately?

WITNESS: We average about 10 to 15 homicides a year, so probably about 100, 150 homicides.

. . .

PROSECUTOR: How much time did you spend with the defendant that night?

WITNESS: Throughout the entire evening?

PROSECUTOR: Right. For how long were you in his presence from May the 7th of 2004 through May the 8th of 2004?

WITNESS: I would estimate it to be four hours.

PROSECUTOR: And during that period of time, did you have an opportunity to determine whether the defendant was under the influence of alcohol or marijuana or any controlled dangerous substance?

WITNESS: Yes.

PROSECUTOR: And you're familiar, investigator, with the symptoms that people exhibit when they are under the influence of those things?

WITNESS: Yes, I am.

PROSECUTOR: Did the defendant appear to be under the influence of anything?

WITNESS: No, he did not.

On cross-examination, defense counsel pointed out to the jury that Investigator Mitchell did not conduct any drug testing on defendant:

DEFENSE COUNSEL: Now, you indicated that he appeared not under the influence of any alcohol or drugs; correct?

WITNESS: That's right.

DEFENSE COUNSEL: You didn't perform any type of tests, did you?

WITNESS: No, no chemical tests were performed, or anything of that nature.

DEFENSE COUNSEL: And why was that? Any reason?

WITNESS: There was no need to. When I met with Peter he appeared to me to be normal, not under the influence of any drugs or alcohol.

DEFENSE COUNSEL: In testing for marijuana, isn't it rather common for the police to administer a urine test?

At that point, the prosecutor objected and defense counsel rephrased the question:

DEFENSE COUNSEL: In your police experience, is it common to test for the use of marijuana with a urine test?

WITNESS: I've never conducted one of those tests. I don't know.

The judge then intervened:

THE COURT: Let me ask you this question. You've gone to investigative schools?

WITNESS: Yes, sir.

THE COURT: How many?

WITNESS: Numerous.

THE COURT: You've been working major crimes for eleven years? Twelve years?

WITNESS: Yes, sir.

THE COURT: In your experience *have you ever heard, seen or otherwise participated in any training, experience or police investigative work that included taking a urine sample of somebody you were about to interview?*

WITNESS: No.
[(Emphasis added).]

At the close of trial, the jury requested that it be provided with the judge's instructions in writing. The judge denied that request and explained in detail his reasons for doing so:

THE COURT: You can't have it. That's the simple answer. That's not part of our process. That's not part of our procedure. I can speculate on why we don't do it that way, but it's not really important, because I'm not going to give it to you. All right.

. . .

[I]t probably seems a little silly that we require lay jurors to take the instruction as to the law, apply it to the facts, and not give you the benefit of being able to read it and understand it and digest it . but our rules don't provide for me to send the charge to you in there. There are some judges that have done it in other cases that I'm aware of around the state. It's not a practice that I think is a good practice.

. .

[I]f I were to send you all of these words in there, you would be distracted from your task. Your task is not to become lawyers. Your task is not to get lost in these words. Your task is to be the judges of the facts, of the evidence presented in this case.

. . .

I'll tell you the elements as many times as you want. I'll review the burden of proof as many times as you would like. I will answer as many questions as you have, as often as you ask them, but I will not send you the charge complete in the jury room.

The jury returned a guilty verdict shortly after deliberations began. Defendant was sentenced to an aggregate minimum custodial term of 130 years. He appealed and the Appellate Division affirmed. We granted defendant's petition for certification, 199 N.J. 127, 970 A.2d 1044 (2009) [4], and now reverse.

## II.

Defendant argues that the trial judge's questioning of the witnesses was improper and denied him a fair trial; that the trial

---

[4] This order vacated a prior order granting certification and remanding the matter to the Appellate Division, 198 N.J. 472, 968 A.2d 1188.

judge erred in refusing to provide the jury with the written jury instruction it had requested; and that his sentence was excessive.

The State counters that the judge had the right to interrogate the witnesses; that defendant did not object to the questioning and did not satisfy the plain error standard; that the judge's refusal to provide a written charge was within his discretion under *Rule* 1:8–8; and that defendant's sentence was proper.

### III.

We turn first to defendant's claims regarding the judge's questioning of the witnesses at trial. *N.J.R.E.* 614 explicitly grants judges the right to question witnesses "in accordance with law and subject to the right of a party to make timely objection." Additionally, we have held that trial judges possess broad discretion to intervene in a criminal trial where necessary. *See State v. Ray*, 43 *N.J.* 19, 25, 202 *A.2d* 425 (1964). Indeed, it is proper, and even encouraged, for a trial judge to step in when a party's basic rights are being threatened, *State v. Guido*, 40 *N.J.* 191, 207, 191 *A.2d* 45 (1963), when expedition is necessary to prevent a waste of judicial time/resources, *ibid.*, when testimony requires clarification, *ibid.*, or when a witness appears to be in distress or is having trouble articulating his/her testimony, *State v. Riley*, 28 *N.J.* 188, 200–04, 145 *A.2d* 601 (1958), *cert. denied*, 359 *U.S.* 313, 79 *S.Ct.* 891, 3 *L.Ed.*2d 832 (1959). However, that right is limited—particularly in the context of a jury trial, where the judge is not the factfinder—to ensure that a court does not telegraph to the jury any partiality to a given party's side. *See Taffaro, supra*, 195 *N.J.* at 451, 950 *A.2d* 860. We have warned that

> [the trial judge] should bear in mind that his undue interference, impatience, or participation in the examination of witnesses, or a severe attitude on his part toward witnesses ... may tend to prevent the proper presentation of the cause, or the ascertainment of the truth in respect thereto.
>
> [*Guido, supra*, 40 *N.J.* at 207, 191 *A.2d* 45 (citation omitted).]

Our expressions on the subject mirror those of other jurisdictions, which have similarly warned that when trial judges question witnesses they "should not show bias or feeling nor be

unduly protracted." *Commonwealth v. Hammer,* 508 *Pa.* 88, 494 *A.*2d 1054, 1060 (1985) (quoting *Commonwealth v. Watts,* 358 *Pa.* 92, 56 *A.*2d 81, 83 (1948)). Although it is within the purview of a trial judge to question a witness to clarify ambiguities, he

cannot assume the mantle of an advocate and take over the cross-examination for the government to merely emphasize the government's proof or to question the credibility of the defendant and his witnesses. A judge's slightest indication that he favors the government's case can have an immeasurable effect upon a jury. [*United States v. Bland,* 697 *F.*2d 262, 265–66 (8th Cir.1983) (footnote omitted).]

When a judge questions a witness in such a way that he takes over the role of the prosecutor, it can give the jury the impression that the judge does not believe the witness, and that impression can deny the defendant his right to a fair trial. *See United States v. Filani,* 74 *F.*3d 378, 385 (2d Cir.1996). Not showing bias is particularly important when a criminal defendant is testifying, and a judge must scrupulously insure that his questions do not evidence disbelief. *See United States v. Saenz,* 134 *F.*3d 697, 709 (5th Cir.1998).

Most recently, in *Taffaro,* we reiterated the importance of limiting judicial questioning during a jury trial to protect the defendant's right to fair and balanced proceedings. *Taffaro, supra,* 195 *N.J.* at 450–51, 950 *A.*2d 860. The outcome of that case hinged directly upon whether the jury believed defendant's version of the facts or the version of the facts offered by the prosecution.[5] *Id.* at 452, 950 *A.*2d 860. We said:

During jury trials, though, trial courts should use great restraint in questioning witnesses in order not to influence the jury. [*Ridgewood v. Sreel Inv. Corp.,* 28 *N.J.* 121, 132, 145 *A.*2d 306 (1958).] As Chief Justice Weintraub observed nearly a half century ago, trial judges are "imposing figure[s]"; to jurors, they symbolize "experience, wisdom, and impartiality." *Guido, supra,* 40 *N.J.* at 208, 191 *A.*2d 45. Therefore, if a judge's questions "suggest disbelief, the impact upon the jurors may

---

[5] The case centered on the posting of an illicit Craigslist ad, which invited interested parties to call "the lady of the house"—defendant's sister, with whom he was feuding over their parents' estate—for sexual favors. *Taffaro, supra,* 195 *N.J.* at 445–47, 950 *A.*2d 860. Defendant maintained that he did not post the ad, but that his friends did so from his computer and without his knowledge. *Id.* at 446–47, 950 *A.*2d 860. Defendant's friends testified that he posted the ad and they merely showed him how to do so. *Id.* at 447, 950 *A.*2d 860.

be critical." *Ibid.* This is especially true when the outcome of a case rests "primarily and necessarily" on the jury believing or rejecting a defendant's version of events. *State v. Ray*, 43 *N.J.* 19, 25–30, 202 *A.2d* 425 (1964) (finding reversible error in trial court's questioning of defendant, which signaled "doubts as to her credibility").

In addition, while it is proper for judges to attempt to clarify testimony, they should not press defendants when the meaning of their responses is "perfectly plain." *Guido, supra,* 40 *N.J.* at 208–09 n. 2, 191 *A.2d* 45. Questions of that sort may express incredulity and prejudice a defendant.

\* \* \*

The critical concern, of course, is that a court not suggest to jurors through its questioning that it is taking one party's side. To do so is to "cross the fine line that separates advocacy from impartiality." *Ridgewood, supra,* 28 *N.J.* at 132, 145 *A.2d* 306.

[*Taffaro, supra,* 195 *N.J.* at 451, 950 *A.2d* 860.]

In *Taffaro,* we concluded that the judge's questioning of defendant denied him a fair trial because it

had the effect of suggesting to the jury that the court doubted defendant's account in a case that rested heavily on defendant's credibility. The questions also covered, in part, terrain that had already been crossed. Rather than clarify points in a witness's testimony, the court's questions had the capacity to signal disbelief. The overall length of the questioning—amounting to half the time of the prosecutor's brief cross-examination—compounded the error. But it is the impact of the court's questions, and not the number of minutes they lasted, which matters most.

\* \* \*

In light of the trial judge's esteemed position in the courtroom and the central role that defendant's credibility played in this trial, suggesting disbelief of defendant's testimony could well have had a critical impact on the verdict. *See Ray, supra,* 43 *N.J.* at 26–30, 202 *A.2d* 425; *Guido, supra,* 40 *N.J.* at 207–08, 191 *A.2d* 45. As a result, the trial court's questions warrant reversal. *See R.* 2:10–2. We are not persuaded that the jury instruction was sufficient to cure the harm. *See Guido, supra,* 40 *N.J.* at 208, 191 *A.2d* 45 (trial court's questions were prejudicial despite judge's "repeated assurances to the jury that he was acting in the interest of justice with no purpose of aiding or hurting the prosecution or the defense").

[*Id.* at 453–54, 950 *A.2d* 860.]

Applying those principles to the evidence in this record, and reviewing the matter under the plain error standard, *Rule* 2:10–2, we conclude that the judge's questioning of defendant, his expert, and Investigator Mitchell falls squarely within the interdiction of *Taffaro.*

■ During cross-examination of defendant, the prosecutor spent a significant amount of time attempting to discredit defendant's assertion that he could not remember shooting his parents or confessing that crime to the police. On redirect examination, defense counsel attempted to correct the implication that defendant was lying, and on re-cross examination, the prosecutor again challenged defendant's alleged inability to remember either the shooting or his confession. At that point, the matter had been fully aired, yet the judge interjected to ask again about the memory issue. Indeed in rapid-fire, he posed a series of questions to defendant about specific facts that defendant had acknowledged he remembered and juxtaposed those against defendant's claim that he could not recall the circumstances surrounding the shooting, hammering home the prosecutor's view of defendant's memory as selective, and leaving the impression that he did not believe defendant's claim.

That questioning directly violated *Taffaro*. There is a vast difference between asking follow-up questions for clarity and forcing a defendant to repeat himself when the meaning of his responses is already "perfectly plain." *Taffaro, supra,* 195 *N.J.* at 451, 950 *A.*2d 860 (quoting *Guido, supra,* 40 *N.J.* at 208–09 n. 2, 191 *A.*2d 45). The former intervention is meant to ease the jury's task while still ensuring fairness to defendant; the latter will strongly suggest to the jury that defendant is not to be believed. Although the judge reminded the jury that his questions to defendant were not to be given additional weight, the very existence and format of those questions likely communicated to the jury that defendant's credibility should be seriously doubted. Indeed, none of the judge's questions elucidated facts not already clearly communicated to the jury several times. "While defendant's answers may have been hard to believe, that issue was for the jury alone to decide." *Taffaro, supra,* 195 *N.J.* at 452, 950 *A.*2d 860. Because it is unlikely that the jurors would view the judge's questions—which were almost identical to the prosecutor's—as efforts to provide them with newer or clearer informa-

tion, the only inference they could draw from the judicial intervention was that defendant's testimony probably was not true.

■ The judge's questions of defendant's medical expert were equally damaging to the overall fairness of the trial. During the first interruption, the judge questioned Dr. Verdon about what defendant had told him regarding his memories of the night of the murder. In contrast with defendant's trial testimony relating some memories of that night, the judge pressed Dr. Verdon to say that defendant had told him he had no memory of that night and asked: "Would you have noted in your notes if he told you that he had a specific recall, a present recall. . . . You would have put that down. . . . And you didn't put that down?" By that pointed inquiry, the judge cast a cloud over defendant's trial testimony.

More damning was the judge's interruption of Dr. Verdon's testimony about defendant's lack of memory of the confession which Dr. Verdon attributed to defendant's being "under the influence" of drugs. Expressing clear disbelief in the witness's conclusions, the judge even deconstructed the timeline of the day of the crime, including taking judicial notice of the time it takes to drive from Newark to Toms River, in an obvious effort to show that too much time had elapsed since defendant's last ingestion of drugs for him to have been under the influence when he initialed his statement. Those repetitive questions, which specifically suggested that the witness was testifying contrary to the documents in evidence, continued for six pages in the transcript and included the judge's question: "And you call that under the influence?" Those questions, which would have been entirely appropriate if propounded by the prosecutor, should not have come from the judge.

■ A different problem was presented by the judge's involvement in the testimony of Investigator Mitchell. On direct examination, Investigator Mitchell was clear and unequivocal regarding his observations of defendant's condition on the day he gave his statement; he did not believe defendant was under the influence. On cross-examination, defense counsel inquired about the absence

of drug testing. Instead of allowing the prosecutor to address that issue, the judge broke into the cross-examination culminating with the following exchange:

> THE COURT: You've been working major crimes for eleven years? Twelve years?
>
> WITNESS: Yes, sir.
>
> THE COURT: In your experience, have you ever heard, seen or otherwise participated in any training, experience or police investigative work that included taking a urine sample of somebody you were about to interview?
>
> WITNESS: No.

That questioning should have been left to the prosecutor. Instead, the judge effectively hammered nails into defense counsel's ongoing cross-examination and bolstered the State's witness.

Here, the defense was made up of three prongs: defendant's own testimony about his drug- and depression-induced condition on the night of the murder and at the time of the confession; his expert's testimony regarding the effects of defendant's condition; and the neutralization of witnesses who saw defendant and opined that he was not under the influence of drugs. The judge intervened on each of those prongs, by expressing disbelief when defendant and his expert testified, and by helping to counter defendant's challenge to Investigator Mitchell.

As we have said, a judge has a right to question witnesses in a criminal trial. But that right is tethered to ensuring the fairness of the proceedings, to expedition, and to the clarification of ambiguities. None of those matters was at issue here. Here, the judge's questioning was gratuitous and evidenced incredulity with respect to defendant's only defense, along with support for the State's witness. As in *Guido*, the "judge's repeated assurances to the jury that he was acting in the interest of justice with no purpose of aiding or hurting the prosecution or the defense" rang hollow and were not sufficient to cure the harm. *Guido, supra,* 40 *N.J.* at 208, 191 *A.*2d 45.

Defendant was entitled to face a single adversary, the State. He should not have had to bear the consequences of a judge who appeared to disbelieve him and his expert witness, revealed that

disbelief to the jury, and supported a witness adverse to him. Because that conduct was clearly capable of producing an unjust result, a new trial is in order.

## IV.

■ Defendant next urges us to declare that the trial judge's refusal to provide the jury with written instructions warrants reversal. Because he did not object to that ruling, the plain error standard again is applicable. *R.* 2:10–2. That standard was not met by the judge's refusal to share written instructions with the jury and does not warrant our intervention. However, the subject calls for brief discussion.

*Rule* 1:8–8(a) explicitly provides that "[t]he court, in its discretion, may submit a copy of all or part of its instructions to the jury for its consideration in the jury room." The rules have designated that as a discretionary right. To ensure that verdicts are the result of each juror's equal understanding of the facts and the law as it applies to those facts, judges are granted leave to consider whether or not issuing written instructions would be helpful or harmful in a particular case. *See State v. Lindsey,* 245 *N.J.Super.* 466, 474–75, 586 *A.*2d 269 (App.Div.1991).

In this case, the judge explained to the jury why he was declining to issue written instructions. He told the jurors "[t]hat's not part of our process. That's not part of our procedure[,]" and that the "rules don't provide for me to send the charge to you in there." Clearly, as noted above, the rules do provide for a judge to send a written charge to the jury if he chooses to do so. Here, the judge added that "[t]here are some judges that have done it in other cases that I'm aware of around the state. It's not a practice that I think is a good practice," suggesting that, contrary to what he had said, he knew that he had the right to provide written instructions. He then explained his concern that the jurors' possession of written instructions would distract them from their fact-finding task, and assured them that he would "answer as many questions as you have, as often as you ask them...."

The purpose underlying *Rule* 1:8–8 is to authorize the judge to provide the jury with written instructions where it would be helpful. Deciding what to do requires an exercise of discretion based on the particular facts of the case. That does not include the adoption of a blanket rule regarding the provision of written instructions that the judge applies in every case. Thus, at trial, a judge should make an individualized decision regarding the submission of written instructions to the jury on the basis of what is before him and not on any preconceived policy rationale.

Because the rule is silent regarding the kinds of considerations that should inform such a determination, we refer the matter to the Civil and Criminal Practice Committees for consideration of a more detailed standard to guide judges in exercising their discretion. By way of example, but not limitation, the committees should consider whether, if there is a request, there should be a presumption that instructions that are immediately available will be provided; whether there should be a contrary presumption that instructions that are not immediately available will not be provided; whether a definition of "immediately available" should be adopted; and what kinds of considerations regarding the nature of the case should factor into the judge's *Rule* 1:8–8 calculus.

## V.

The judgment of the Appellate Division is reversed. The matter is remanded to the trial court for the vacation of the judgment of conviction and a new trial. This ruling renders defendant's sentencing claim moot.

Justice RIVERA–SOTO, concurring in part and dissenting in part.

To the extent the majority concludes that the trial court's refusal to provide its written instructions to the jury did not constitute plain error and, hence, "does not warrant our intervention[,]" *ante* at 540, 984 *A.*2d at 892, I concur. However, to the extent the majority is of the view that the questioning of defen-

dant and other witnesses by the trial judge exceeded the limits we recently reiterated in *State v. Taffaro,* 195 *N.J.* 442, 950 *A.*2d 860 (2008), I must respectfully dissent. I do so substantially for the reasons cogently expressed by the Appellate Division in affirming defendant's convictions for the knowing and purposeful murder of his parents plus related weapons and theft offenses, but vacating and remanding defendant's sentence.

As properly couched by the Appellate Division, the true issue before it—and before us—"is whether the trial judge's intervention in the proceedings was improper and resulted in depriving defendant of a fair trial." Noting that "[d]efendant's trial counsel did not raise any objection to the trial judge posing questions to prosecution or defense witnesses[,]" the panel explained that an appellate court "may reverse defendant's conviction only if [it] find[s] that the trial judge's behavior constitutes plain error." (citing *R.* 2:10–2). It explained that "[i]n determining whether an alleged error is plain error, courts must determine if the nature of the error is 'clearly capable of producing an unjust result.'" (quoting *ibid.*). It cautioned that "[t]he possibility of an unjust result must be 'sufficient to raise a reasonable doubt as to whether the error led the jury to a result it otherwise might not have reached.'" (quoting *State v. Macon,* 57 *N.J.* 325, 336, 273 *A.*2d 1 (1971)).

The Appellate Division reasoned that, although "trial judges possess 'broad discretion' as to when and how to participate in a given criminal case, ... a judge must maintain an impartial atmosphere and avoid the appearance of supporting either the defense or the prosecution." (citing *State v. Ray,* 43 *N.J.* 19, 25, 202 *A.*2d 425 (1964)). Quoting *Ray, supra*—which, in turn, quoted *State v. Guido,* 40 *N.J.* 191, 207, 191 *A.*2d 45 (1963)—the panel emphasized that

> [the trial judge] should bear in mind that his undue interference, impatience, or participation in the examination of witnesses, or a severe attitude on his part toward witnesses, especially those who are excited or terrified by the unusual circumstances of a trial, may tend to prevent the proper presentation of the cause, or the ascertainment of the truth in respect thereto.

At bottom, the panel stated the operative rule succinctly: "[w]hen intervening to question witnesses, the trial judge should lead jurors to understand that the purpose of the intervention is to aid their understanding, not to advance the case of one side or the other." (citing *ibid.*). It noted that "[o]ne of the recognized purposes of judicial intervention in the questioning of witnesses is to clarify testimony for the jury." (citing *ibid.*). In that vein, it repeated that "it is not an abuse of discretion to question a witness, even when those questions would have been better left to the prosecutor, so long as those questions are relevant and are not 'beyond justification as attempts by the court to clarify the issues.'" (quoting *State v. Kelly,* 118 *N.J.Super.* 38, 51–54, 285 *A.*2d 571 (App.Div.), *certif. denied,* 60 *N.J.* 350, 289 *A.*2d 795 (1972)). It summarized the governing principle in a clear and straightforward manner: "so long as a trial judge maintains an impartial atmosphere, and makes clear to the jury that credibility determinations are solely a jury function, the judge has not committed reversible error." (citing *State v. Ross,* 162 *N.J.Super.* 47, 52, 392 *A.*2d 210 (App.Div.1978), *aff'd in part, rev'd in part,* 80 *N.J.* 239, 403 *A.*2d 457 (1979)).

Applying those principles, the Appellate Division found that "the trial judge questioned both prosecution and defense witnesses when he perceived an ambiguity in the witness' testimony." It further found that "[t]he judge also made a point of reminding the jury members that they were not to give any additional weight to the questions he asked and that they remained the sole finders of fact in the case[,]" observing that "[t]he trial judge intervened a total of four times during defendant's six-day trial." After reviewing the record at length—and without divining from the record the arbitrary and factually unfounded emphases that animate the majority's opinion [1]—the panel concluded that "the trial judge did

---

[1] Unlike *Taffaro, supra,* where the trial was videotaped and a video recording of the trial available for appellate review—thus permitting a full review of the "look and-feel" of the trial judge's questioning—the record in this case consists

not act in a partisan manner, nor did he question the credibility of defense witnesses or impugn the defendant's character." (citing *Guido, supra*, 40 *N.J.* at 194–208, 191 *A.2d* 45; *Ray, supra*, 43 *N.J.* at 27–29, 202 *A.2d* 425). It also concluded that the trial judge "intervened at times when he felt that the witnesses' testimony needed to be clarified and, therefore, acted within his discretion." It remarked that, "[n]otably, the trial judge questioned both prosecution and defense witnesses in an evenhanded manner and repeatedly instructed the jury that his questions should not be given more weight than those asked by the attorneys[,]" and that the trial judge "also repeatedly advised the jury that it was the sole finder of fact in the case." The panel held that, "[a]fter consideration of the entire record, we do not find that the intervention of the trial judge indicated partiality or deprived defendant of a fair trial."

That analysis and its corresponding conclusions are unassailable. To conclude on this sterile record, as the majority does, that "the judge's questioning of defendant, his expert, and Investigator Mitchell falls squarely within the interdiction of *Taffaro*[,]" *ante* at 536, 984 *A.2d* at 890-91, is an unwarranted and perilously amorphous limitation of principles well-founded in our jurisprudence. *See N.J.R.E.* 614 (explicitly authorizing trial judges to "interrogate any witness"). Therefore, for the reasons that undergird the judgment of the Appellate Division, I would affirm defendant's convictions.[2]

I, therefore, respectfully dissent.

---

solely of the trial transcripts, absent any of the intonations expressly imputed in the majority's opinion.

[2] Defendant also challenged his sentence as excessive. The majority, by reason of its remand for a retrial, determined that issue to be moot. *Ante* at 541, 984 *A.2d* at 893. Again, I would affirm the judgment of the Appellate Division that the trial court "incorrectly considered *N.J.S.A.* 2C:44–1[(]a[)](12) as an aggravating factor and[, for that reason,] defendant's sentence must be vacated and the matter remanded for resentencing."

*For reversal and remandment*—Chief Justice RABNER and Justices LONG, LaVECCHIA, ALBIN, WALLACE and HOENS—6.

*Concurring in part and dissenting in part*—Justice RIVERA-SOTO—1.