JUSTICE TIMPONE,
dissenting.
Walk into any trial courtroom in this State—whether furnished in gray gunmetal or carved wood—the centerpiece is the judge’s bench, rising above all else and all others. That is not happenstance. The message is clear: the judge presides; the judge decides; the judge has the final word.
Trial lawyers are well aware of a judge’s impact on a sitting jury. Judges dote on jurors. They generally exhibit kindness and understanding toward jurors, making them feel welcome and part of the process. Judges often banter with jurors, recognize when they need a break, and try to accommodate their schedules. As jurors enter and exit the courtroom, many judges stand in deference. Notably, jurors return the deference. Jurors may raise an eyebrow at the lawyers’ arguments and examinations but they usually take a judge’s pronouncements as gospel. When a judge speaks, jurors listen.
Jurors do not see judges as partisans; they view the judges as impartial decision-makers who have no stake in the outcome of the trial. When a judge drifts from being a pillar of neutrality, most jurors do not recognize the drift but do recognize the subtle cues. Often the drift is inadvertent, singular in nature, and harmless. But not in this case.
Here, the trial judge’s extensive cross-examination of fourteen of the State’s seventeen witnesses, through colloquies extending for well beyond thirty pages of transcripts, “cross[ed] that fine line that separates advocacy from impartiality.” Ridgewood v. Sreel Inv. Corp., 28 N.J. 121, 132, 145 A.2d 306 (1958). His cumulative actions created sufficient reasonable doubt as to whether the errors “led the jury to a result it otherwise might not have reached.” State v. Macon, 57 N.J. 325, 336, 273 A.2d 1 (1971). The *417 judge’s unrelenting questioning prejudiced defendant and, therefore, is plain error that warrants the reversal of defendant’s conviction. R. 2:10-2.
As a result, I cannot stand with the majority, and I respectfully dissent.
I.
“The trial judge is an imposing figure. To the jurors he is a symbol of experience, wisdom, and impartiality. If he so intervenes as to suggest disbelief, the impact upon the jurors may be critical.” State v. Guido, 40 N.J. 191, 208, 191 A.2d 45 (1963); see Ridgewood, supra, 28 N.J. at 132, 145 A.2d 306; Macon, supra, 57 N.J. at 336, 273 A.2d 1. Legal scholars have long been conscious of the impact judges have on juries. See, e.g., Peter David Blanck et al., The Appearance of Justice: Judges’ Verbal and Nonverbal Behavior in Criminal Jury Trials, 38 Stan. L. Rev. 89, 89 (1985) (studying relationship between trial judge’s “ ‘appearance,’ or conduct and behavior” and jury’s verdict).
Shortly after the trial of this matter, this Court reaffirmed Guido in State v. Taffaro, 195 N.J. 442, 950 A.2d 860 (2008) and State v. O’Brien, 200 N.J. 520, 984 A.2d 879 (2009). Although those cases are not binding as to the matter at hand, they demonstrate this Court’s continued support of the long-standing limits on judicial advocacy.
The O’Brien Court explained the scope of N.J.R.E. 614 and elucidated the appropriate circumstances under which a trial judge should interject and ask questions—namely, when a party’s basic rights are being threatened, when it is necessary to expedite the trial and prevent waste, or to clarify when a witness has trouble articulating an answer. O’Brien, supra, 200 N.J. at 534, 984 A.2d 879. When a judge goes beyond those confines, the Court determined, a defendant may be deprived of a fair trial “[i]n light of the trial judge’s esteemed position in the courtroom.” Taffaro, supra, 195 N.J. at 454, 950 A.2d 860. Indeed, with respect to a witness whose credibility played a “central role” in the trial, the Court *418 reasoned that the judge’s “suggesting disbelief of [the witness’s] testimony could well have had a critical impact on the verdict.” Ibid.
In O’Brien, we vacated a defendant’s conviction for murdering his parents because of the invasive role the judge played at trial. O’Brien, supra, 200 N.J. at 541, 984 A.2d 879. There, the defendant confessed to shooting his parents and asserted a defense of diminished capacity based on drug intoxication and depression. Id. at 523, 525, 984 A.2d 879. We found improper the trial court’s direct questioning of the defendant, who had already been extensively examined about his memory of the events; the court’s questioning of the expert witness regarding memory loss from the defendant’s addiction to marijuana; and the court’s questioning of an officer’s experience. Id. at 526-27, 984 A.2d 879. The trial court’s “rapid-fire” questioning of the defendant “hammer[ed] home the prosecutor’s view of [the] defendant’s memory as selective, and [left] the impression that [the court] did not believe [the] defendant’s claim.” Id. at 537, 984 A.2d 879.
We explained that when a judge questions a witness who has already given “perfectly plain” answers, it “strongly suggests] to the jury that [the witness] is not to be believed.” Ibid. Similarly, with regard to the expert witness, the trial court “[e]xpress[ed] clear disbelief in the witness’s conclusions.” Id. at 538, 984 A.2d 879. Ultimately, we found the judge’s excessive questioning “damaging to the overall fairness of the trial,” and that defendant was “entitled to face a single adversary, the State.” Id. at 537, 539, 984 A.2d 879. Accordingly, we found that a new trial was proper because the defendant “should not have had to bear the consequences of a judge who appeared to disbelieve him and his expert witness, revealed that disbelief to the jury, and supported a witness adverse to him.” Id. at 539-40, 984 A.2d 879.
Federal courts have applied the same constraints to the analogous Federal Rule of Evidence 614. The Third Circuit explained that “[j]udges must be especially careful about their conduct during trial because they hold a position of special authority and *419 credibility in the eyes of the jury” and cross-examination by the court “can prove fatal to a witness’s credibility.” United States v. Ottaviano, 738 F.3d 586, 595 (3d Cir. 2013), cert. denied, — U.S. —, 134 S.Ct. 1922, 188 L.Ed.2d 945 (2014). “[Cjross-examination of a witness by the trial judge is potentially more impeaching than such an examination conducted by an adversary attorney.” United States v. Godwin, 272 F.3d 659, 678 (4th Cir. 2001), cert. denied, 535 U.S. 1069, 122 S.Ct. 1942, 152 L.Ed.2d 846 (2002).
The federal courts warn that “[a] trial judge’s isolated questioning to clarify ambiguities is one thing; however, a trial judge cannot assume the mantle of an advocate and take over the cross-examination for the government to merely emphasize the government’s proof or question the credibility of the defendant and his witnesses.” United States v. Beaty, 722 F.2d 1090, 1095 (3d Cir. 1983) (quoting United States v. Singer, 710 F.2d 431, 436-37 (8th Cir. 1983) (en banc)). “Even when the evidence provides the court with a negative impression of the defendant, the judge must refrain from interjecting that perception into the trial.” Godwin, supra, 272 F.3d at 678.
Where a judge engages in extensive questioning, the appellate court must apply a “balancing process” to “determine whether the trial judge’s comments have pervaded the overall fairness of the proceeding.” Ottaviano, supra, 738 F.3d at 596 (quoting United States v. Wilensky, 757 F.2d 594, 598 (3d. Cir. 1985)). When the judge’s questioning becomes “lengthy” or “over-zealous,” spanning several pages of the trial transcripts, the judge has overstepped the bounds of prudent judicial conduct. Beaty, supra, 722 F.2d at 1096.
This Court’s admonition against trial-judge-overreach did not begin with Taffaro and O’Brien. It long predated those cases. Even if the expansive list of cautionary cases instructing judges on their neutral and impartial roles that foreshadowed this trial did not exist, the basic principles of fairness did. For years our judicial code of ethics was embedded with convictions of neutrality and fairness:
*420 [A judge] may properly intervene in a trial of a case to promote expedition, and prevent unnecessary waste of time, or to clear up some obscurity, but he should bear in mind that his undue interference, impatience, or participation in the examination of witnesses, or a severe attitude on his part toward witnesses, especially those who are excited or terrified by the unusual circumstances of a trial, may tend to prevent the proper presentation of the cause, or the ascertainment of the truth in respect thereto.
[Guido, supra, 40 N.J. at 207, 191 A.2d 45 (quoting Canons of Judicial Ethics, Canon 16 (1924)).]
Trial judges intuitively know that they cannot buttress a party’s witness, show negative emotions about the testimony of an alibi witness, or coach either party’s counsel without having an impact on the jury. As Bob Dylan once wisely said, “You don’t need a weatherman to know which way the wind blows.” Bob Dylan, Subterranean Homesick Blues, on Bringing It All Back Home (Columbia Records 1965).
The trial court here went far beyond the purview of N.J.R.E. 614 and all guidance on the matter. The record reveals that the trial judge put his thumb on the scale, time and time again, and prejudiced defendant. The judge’s actions were even more significant in a factually close case like this, where there was little physical evidence and where the State relied heavily on the credibility of seventeen witnesses at trial—fourteen of whom faced prejudicial interrogation by the court.
II.
Defendant Michael Ross was charged with committing a double murder and other related offenses. The State’s trial theory was that defendant mistakenly shot and killed the two victims, thinking that one of them, who had previously threatened him, had brandished a firearm. Defendant denied any involvement in the killings.
Accounts of the killings were central to the outcome of the trial, and the witnesses’ testimonial credibility was crucial to the verdict. Of the seventeen witnesses presented by the State, the trial judge questioned fourteen of them—at times interrupting the attorneys’ questioning. Many of the judge’s actions unequivocally strengthened the testimony of the State’s law enforcement and *421 expert witnesses. In other instances, the judge developed those same witnesses’ expertise in areas that had not been developed by the prosecution or the defense. With another witness, the judge exhibited incredulity in his tone and demeanor, casting doubt upon that witness’s credibility—whose testimony was important to the defense.
Examples are numerous. The trial judge conducted a friendly examination of Officer Lyons, a State witness. The examination highlighted how Lyons was instrumental in reinvigorating this cold case and sought specific times and dates of relevant events. This effort by the judge undermined defense counsel’s extensive cross-examination that challenged Lyons’s aggressive interrogation tactics used to elicit statements from several of the State’s other witnesses. The exchange is not, as the majority has characterized it, an instance of clarification. The prejudicial effect comes after the passage quoted by the majority, when the judge rehabilitates the witness, painting him as the reviver of a cold case, and returning to mundane details far less incriminating than coercion. The tenor of the judge’s exchange buttressed the detective’s credibility and rehabilitated the witness after defense counsel’s cross-examination.
Similarly, the court interfered with defense counsel’s cross-examination of Clements, one of the State’s investigators, who was present when Wakefield, a key witness for the State, gave a statement to the police explaining that defendant had admitted to the murders. Wakefield, facing charges in an unrelated case, recanted his testimony, stating that police pressured him into making the incriminating statement against defendant. Investigator Clements’s testimony attempted to rebut Wakefield’s claims that he had been unduly pressured during seven-and-one-half hours of questioning that included a polygraph examination. During lengthy cross-examination, defense counsel elicited testimony indicating that the polygraph examination of Wakefield actually took less time than Investigator Clements originally stated. The import of the elicited testimony was that the majority of the *422 seven-hour period was spent interrogating Wakefield, aiding Wakefield’s claim (and defendant’s theory) that he was pressured into making a statement against defendant. In the midst of cross-examination, the judge called counsel to sidebar and limited defense counsel’s efforts on that point. As the Appellate Division majority conceded, that sidebar disrupted development of the timeline of Wakefield’s questioning but, in context, the panel found the disruption harmless.
One of court’s most profound interferences occurred during the testimony of Sharhi Roberts, a State witness. On the stand, Roberts disavowed a statement she gave concerning a conversation she had with defendant during which defendant confessed to committing the murders. First, the judge aided the prosecution’s direct examination, then the judge demonstrated his incredulity of Roberts’s testimony that was favorable to defendant.
On the heels of other intrusions, the judge interrupted the prosecutor’s examination, interjecting with instructions to the prosecutor on how to probe Roberts on defendant’s recantation. Apparently not satisfied with the prosecutor’s examination of the State’s witness, the judge gave the prosecutor detailed instructions on the questions to ask in order to elicit the necessary testimony, in the presence of the jury. Thereafter, the prosecutor resumed examination, no longer fumbling, but instead asking crisper, tighter questions.
[PROSECUTOR]: Okay. Let me ask you to take a long minute and look at your statement from January 26th, 2006, and tell us on what page you indicate to the three officers and to your attorney where you state Michael Ross told me he made it up. Take your time.
[THE COURT]: Well, you should ask her whether it was—was it during the taped part of the conversation or during another part.
[PROSECUTOR]: Was it during the taped part of the conversation?
And again:
[PROSECUTOR]: And it’s your testimony that your lawyer sat there and let you say when you were asked the question were there only two times, were there only two times when you discussed the murders at Avenel in Forest view and you answered or were there any other—you were asked were there any other times, correct? So you were asked were there any other times—
*423 [THE COURT]: Why don’t you read the exact question, Prosecutor—
[PROSECUTOR]: Thank you, Judge.
[THE COURT]: —that’s on page 18. What page is that?
[PROSECUTOR]: Referring to page 26—
[THE COURT]: 26.
[PROSECUTOR]: —you were asked the question were there any other times that Michael Ross asked you in reference to the shooting—
[THE COURT]: Talked to you.
[PROSECUTOR]: Talked to you.
[PROSECUTOR]: Thank you, Judge.
[THE COURT]: Read the exact question please.
In the presence of the jury, the judge instructed the prosecutor on the manner and method of using those portions of Robert’s testimony to draw out the inconsistency between her testimony at trial and her statements to the police. While the judge found it appropriate to intervene with Roberts, he did not press with equal force the State’s other two key witnesses—McKnight or Wake-field—signaling to the jury that Roberts’s recantation was questionable, while McKnight’s and Wakefield’s incrimination of defendant was more credible.
Defense counsel sought to illuminate Roberts’s claim that police harassed her into implicating defendant. Yet, the judge interjected several times and suggested disbelief of her testimony:
[DEFENSE COUNSEL]: Can you describe for the jury the manner in which they harassed you with as much specificity as you can.
[ROBERTS]: Okay. They came to my house. I’ve been evicted from places.
[THE COURT]: I’m sorry. Came to your house and what?
[ROBERTS]: They came to my house. Harassed me numerous times.
[THE COURT]: In other words, the question is we need specifics. What did they do? Specifically, what did they do? What did they say? What did they do?
[ROBERTS]: Well—
[THE COURT]: Okay.
[ROBERTS]: They—
[THE COURT]: They came to your house. What else?
Again, the judge intervened:
[DEFENSE COUNSEL]: Okay. So when’s the first time that you can remember the police coming to you and harassing you?
*424 [ROBERTS]: The first time I remember was my father’s house, on 19 Walter Drive, Woodbridge.
[THE COURT]: When? When? When? When? Not where.
[ROBERTS]: I can't remember the exact day.
[THE COURT]: Well, was it like—was it before August—before October 30, 2003, or was it after October 30?
[ROBERTS]: It was after.
[THE COURT]: Was it a month after, a year after?
The court’s questioning indicated mounting frustration with the witness:
[THE COURT]: Was there some sort of preinterview that occurred before the recording begins?
[ROBERTS]: Yes. He stated that he wanted me—
THE COURT: No. No. No. Question was was there portions of the interview that was unrecorded. Yes?
The judge exhibited more than momentary testiness. Not only do those exchanges illustrate the judge’s frustration with the witness, they show his incredulity at testimony that was favorable to defendant. That palpable frustration does not aid the defense, as the majority suggests; instead, it telegraphs the court’s skepticism of Roberts’s testimony.
On several other occasions, the judge engaged in wide-ranging questioning, despite defense counsel’s limited cross-examination or his decision not to cross-examine at all. The court conducted a detailed voir dire examination of the State’s forensic pathology expert, despite no cross by defense counsel. He also questioned the State’s ballistics expert, where defense counsel asked only three questions. Despite defense counsel’s decision not to cross-examine the medical examiner, the judge conducted lengthy questioning about the cause of death. The court’s questioning was far from innocuous because it opened the door for the State’s experts to polish and expand their analyses, bolstering their credibility.
Defense counsel asked only a single question of Officer Ng, an investigating officer testifying for the State. In contrast, the court questioned Ng and established that defendant did not voluntarily speak with police after the October 1 incident, when a maroon Ford Taurus or Mercury Sable pulled up and blocked defendant’s *425 vehicle, in which witness McKnight was a passenger, at a traffic stop. A passenger got out of the maroon car and pointed a gun at defendant, causing defendant to hit two other cars as he sped away from the threat. The trial judge prompted the officer further, eliciting from Ng that he found defendant’s identification inside a vehicle at the scene of the October 1 incident, went to defendant’s house, and asked defendant’s father to have defendant come to police headquarters.
That extracted testimony established that defendant did not go voluntarily to the police station after he was involved in the car accident nor did he report that he was threatened with a gun. Effectively, the court sowed the seeds of distrust of defendant, planting the inference that defendant intended to seek redress for the incident himself through illegal means. The trial judge’s intrusion here had the considerable potential to negatively color the jury’s view of defendant’s trustworthiness and credibility.
The defense theory in this case was “mistaken identity,” that is, the shooter was not defendant but McKnight—someone whom the defense claimed many of the State’s witnesses feared. In his opening statement, defense counsel indicated that defendant had seen the maroon Taurus/Sable several times in the past. He also preferred that the car containing the victims was a red VW Passat. Evidence adduced at trial indicated that the passenger who originally blocked defendant and McKnight’s vehicle was a black man and that the victims in the red Passat were both white men. Defense counsel also suggested that McKnight was the shooter and that he had very poor vision, 20/80, implying that McKnight could easily have mistaken the red Passat for a maroon Taurus/Sable and the white victims for black.
Counsel attempted to support his theory with the testimony of one of the State’s witnesses, Huff. Huff testified that he heard “pops,” went to the scene, and found the victims in the red Passat, barely alive. After defense counsel concluded cross-examination, the court questioned Huff, eliciting additional testimony about the lighting on the night of the shooting, in an apparent attempt to *426 dispel the notion that poor-visioned McKnight was the real shooter.
[THE COURT]: All right. And you said—now, what did you say the lighting condition was there?
[HUFF]: Dark.
[THE COURT]: Dark?
[HUFF]: Yes.
[THE COURT]: No—no street lights?
[HUFF]: No.
[THE COURT]: —of the apartment?
[HUFF]: No.
Refusing to accept Huffs answer, the court made its own determination as to the lighting, and continued:
[THE COURT]: Of course there were lights on. And what time was this around?
[HUFF]: I couldn’t even tell you, your Honor.
[THE COURT]: Okay. What time did you start walking?
[HUFF]: It was dark outside?
[THE COURT]: It was dark outside?
[HUFF]: I guess after dinner.
[THE COURT]: After dinner. What time do you eat dinner usually? Dinner.
[HUFF]: Six-ish.
[THE COURT]: Do you think you were walking around six?
[HUFF]: Maybe seven, 7:30. Digest about an hour.
[THE COURT]: You were coming walking by that car what time do you think it was?
[HUFF]: Well, a lot things taking place between that time.
[THE COURT]: Any idea what time it was?
[HUFF]: Couldn’t tell you that.
[THE COURT]: All right. What kind of night was it?
[HUFF]: It wasn’t cold yet, but that doesn’t happen until the kids go trick-or-treating, following day, so it was still—still decent weather.
[[Image here]]
[THE COURT]: Now, there was some light from—wasn’t there some light from the apartments themselves?
[HUFF]: From the apartments themselves up until I got to this particular apartment.
[THE COURT]: From that particular apartment there wasn’t many lights?
[HUFF]: Dark. Dark. This particular apartment. Dark.
[THE COURT]: The whole apartment was dark?
*427 [HUFF]: Yes.
This instance is of particular concern because the judge acted as a second prosecutor in the courtroom, apparently cross-examining a witness in order to elicit testimony to dispel the theory posed by defense counsel in his opening statement that the poor-visioned McKnight was the shooter who mistook the red Passat for a maroon Mercury. When the witness insisted that it was dark and there were no lights illuminating the scene, the judge rejected the response, replying, “Of course there were lights on.” The judge did more than highlight favorable testimony for the State—he testified on its behalf.
Here looms the deeper issue—the court, having the benefit of hearing the defense’s opening statements and theory of the case, interjected, acting not only as a second prosecutor, but also as a witness. The majority admits that it is uncertain at best that the court’s questioning of Huff had an adverse impact on defendant. Yet such a view minimizes the role of this Court’s review in ensuring a fair trial, even under the plain-error standard. The exchange above was the culmination of many instances of improper interjection.
III.
Jurors are solicitous of judges’s opinions. The judge’s actions in this case indicated a favoritism toward the State and undermined the defense strategy, which is the precise course of conduct that merits a retrial. The trial judge revealed his partiality to the prosecutor’s side by underscoring witness testimony, eliciting witness testimony that had not been developed, and even testifying on the State’s behalf.
Significant portions of the court’s questioning ran afoul of the confines of N.J.R.E. 614—it failed to expedite the trial, provide clarification to a witness’s answer, or redress tactics of the parties. There were no rights threatened, no witnesses in distress, and the trial’s only need for expedition was due to the court’s continuous questioning. Very few of the instances described here can be fairly *428 characterized as mere clarification. Instead, the trial court acted as a second prosecutor in the litigation. Especially problematic is the court’s intervention on multiple occasions when defense counsel chose to engage in minimal or no cross-examination. To simply dismiss the court’s actions by relying on the reasoning that it is not the quantity but the quality of the questions that renders judicial intervention prejudicial flies in the face of basic notions of fairness and justice. At some point, quantity affects quality, and here, we have both an extensive collection of questions and the distinct pollution of prejudice.
The majority relies heavily on defendant’s failure to object to the judge’s interventions. In the normal course of the give and take of trials, motions are made and judges rule. If a party believes the ruling to be in error, that party may object. Here, defense counsel made no objection to the court’s multiple intrusions. In reality, however, interposing an objection would have been no easy task given the nature of the objection in this case— an objection to the trial judge himself.
Objecting to the court’s conduct as improper and prejudicial is different in kind than the prosecutor’s objection here, where at sidebar she reminded the court during the medical examiner’s testimony that determining the cause of death is the province of the jury. Counsel should not be forced into the Hobbesian choice of objecting and raising the ire of the judge for the remainder of the trial, or making the strategic decision of not objecting to avoid heavier interference and being seen by the jury as clearly at odds with the pillar of neutrality. Moreover, the full effects of the judge’s intrusive actions were not felt until the accumulation of over thirty pages of the judge’s examinations—and, by that point, an objection or a paltry curative instruction would not unring the bell.
Prudence by the court is especially critical to ensure a fair trial when the case is close. Here, the jury was deadlocked at first and then deliberated for five days. The case was hard-fought, with a clearly viable defense that gave the jury pause. The Appellate *429 Division majority acknowledged—without accepting—that the lengthy deliberations reflected that the State’s evidence was not overwhelming. In such a close case, there was fertile ground upon which the judge’s extensive questioning might sow mischief. The Appellate Division majority further took solace in the three-week break after the judge’s last intrusions and the beginning of jury deliberations, concluding that the judge’s intrusions had little impact on the fair consideration of the evidence. This is pure speculation cloaked with the patina of justification. In a criminal case this close, where a person’s liberty interest is at stake, the benefit of any doubt should go to the defendant. On this point, I fully agree with the Appellate Division dissent’s analysis that “when a judge sheds the mantle of impartiality, the defendant’s right to a fair trial is at risk.” A new trial is but a small token when considering the stakes here.
The trial court’s actions were not singular. Contrary to the restrictions set forth in our case law and rules of evidence, the judge sowed doubts as to defendant’s theory of the case by buttressing the State’s witnesses, casting doubt with his tone and manner on a critical defense-leaning witness, and testifying himself while adroitly avoiding examining defendant. I embrace, therefore, the plain-error standard applied by the majority, but part with them in their finding of harmless error because the trial judge’s actions cumulatively had the capacity to negatively influence the jury’s view of the defendant.
Where the majority finds that the judge came perilously close to the line, I find that he clearly crossed it, denying the defendant his due process right to a fair trial.
I find plain error and I dissent.